In the Matter of the Accounting of MAX J. PERSHAN et al., as Executors and Trustees under the Will of ELIES KAPLAN, Deceased.

Surrogate's Court, Kings County, May 11, 1949.

*Max J. Pershan* for executors and trustees, petitioners.

*Demov, Callahan & Morris* for Freda Kaplan, individually and as testamentary guardian of Alvan B. Kaplan.

*Sidney Squire,* special guardian for Alvan B. Kaplan, an infant.

*George Rosling,* special guardian for Gerald L. Kaplan and others, infants.

*J. Vincent Keogh,* United States Attorney for the Eastern District of New York (*Jeremiah J. Sullivan* of counsel), for United States Treasury Department, Internal Revenue Service.

*Fred M. Ahern* for State Tax Commission.

McGAREY, S.  There remains to be determined in this proceeding the question of the right and duty of the trustees to set aside a depreciation reserve and maintain the same out of rents collected by them before arriving at the net income available for distribution. The court holds that the trustees have not only the right, but are under a duty, to set aside a part of the rents received by them as a reserve for physical depreciation, caused by wear, tear and obsolescence, as distinguished from depreciation in value because of economic factors.

The question arises by the objections and answer of the two special guardians. One, whose only concern is with principal account represents infant contingent remaindermen of the trust. He objects: (1) to the failure to set up reserves against depreciation of the real properties owned in corporate form at date of death; (2) to the failure to set up reserves against depreciation of the real properties owned in deceased's name at date of death; maintaining in each case that such reserves constitute principal assets of the trust; and, (3) seeks a construction of the will whereby such reserves would be required and the amount be fixed in accordance with deceased's own bookkeeping practice as accepted for income tax purposes.

The ward of the second special guardian is the youngest son of the testator, and the trust term is measured primarily by his minority.  By his answer and report this special guardian seeks construction of the will to the end that any direction in said will which authorizes, either expressly or impliedly, the setting aside from income of the trust of such reserve account for depreciation, be adjudged invalid under section 61 of the Real Property Law and section 16 of the Personal Property Law.  In any event and independent of the provisions of the will he questions the right of the trustees to reserve out of gross rents received a fund for anticipated future repairs and depreciation.

Paragraph " Second " of the will authorizes the trustees to pay the net annual income " after making proper and suitable allowance for expenses and setting up a reserve or sinking fund to meet taxes or other contingencies," to the sons of the testator in equal shares.  The trust is to continue until the youngest son attains the age of twenty-one years, or in the event of his death prior thereto when the second youngest son attains the age of

thirty-seven years, or sooner dies. Remainder is to the sons of the testator, living at the date of termination of the trust or their issue, per stirpes.

Alvin, the youngest son of the testator, was born on February 7, 1941, and was two years and one month old when testator died. Fremont, the next youngest son, was born on September 18, 1924, and was 18 years and six months old at testator's death. The difference in age between the two points out the reason for selecting the thirty-seventh birthday of Fremont as the second and alternate measuring term of the trust.

At the date of his death testator was seized in individual ownership of five parcels of real property improved with apartment houses. In addition he owned all of the stock in each of two corporations which in turn each held record ownership, of an apartment building. Each of these corporations was dissolved at the close of its respective fiscal years following the death of the testator, and the real properties conveyed to the trustees under the will. The aggregate value of all those properties at date of death was $1,289,500. Annual rents approximate $230,000. The rate of depreciation reported by the decedent for income tax purposes upon the buildings was 2% based upon a theoretical life of fifty years. The decedent's practice has been continued by the trustees, for income tax purposes, and the reserve is carried on the books of the trust estate, but is not reported in the account. Assuming for the moment the propriety of such reserve, there would be deducted from income annually an amount in excess of $20,000.

Testator in his lifetime was engaged in the building and sale, or retention, and purchase for investment purposes, of multiple-family dwellings. His income was in the main derived from these operations. For several years prior to his death he did not engage in building operations, presumably because of war conditions. During this period his apparent sole occupation was the management of his realty investments. The scope of his operations in this respect has been heretofore indicated. That he was engaged in business is uncontrovertible. That the nature of his business activity was not that of the manufacturer or the seller of commodities, is beside the point. Testator was for all practical and legal purposes engaged in a business operation, without regard to the fact that his sole income was derived from the rents of real property. His testamentary plan must be examined in the light of these conclusions, if we are to fairly carry out his testamentary plan within permissible legal limits.

The court is thus confronted with the problem of determining the propriety and validity of a reserve for depreciation created by a charge to gross rents of real property embraced in the corpus of a testamentary trust. Subordinate problems arise in connection with the determination of the rate of reserve, nature of the fund and its ultimate disposition.

No appellate court in New York has directly denied either the right or the duty of trustees to establish depreciation reserves, or held that the setting aside of such reserve constituted an unlawful accumulation of income.

It is contended that such rents as are withheld as a reserve for depreciation will be invalidly accumulated contrary to the public policy of this State as expressed in sections 16 of the Personal Property Law and 61 of the Real Property Law. That in turn presents the problem of adequately defining income within the meaning of those sections. An exact, precise definition fitting all conceivable situations is impossible of achievement. Chief Judge Cardozo has stated it thus: " The truth indeed is that what is income in one relation may at times be principal in another. ' Words,' as we are told, ' are flexible ' (*Int. Stevedoring Co.* v. *Haverty,* 272 U. S. 50; *Towne* v. *Eisner,* 245 U. S. 418, 425; *Surace* v. *Danna,* 248 N. Y. 18, 21). ' " Income " like most other words has different meanings dependent upon the connection in which it is used and the result intended to be accomplished ' (*Tax Commissioner* v. *Putnam,* 227 Mass. 522)." (*Equitable Trust Co.* v. *Prentice,* 250 N. Y. 1, 11.)

In the situation before the court it cannot be said that the excess of income over outgo constitutes net income. Apartment buildings, like all things created by human hands, must inevitably decline in value through mere lapse of time, exposure to the elements, and ordinary wear and tear. Thus the payment of the bare excess of receipts over outgo, without some provision to restore capital to its initial utilitarian value, constitutes an encroachment upon corpus. Since the court is required to consider and protect the respective rights of the income beneficiaries and remaindermen, it cannot permit the entire excess of rent receipts over carrying charges to be paid out as income, without reserving what it deems to be a fair and reasonable amount for the preservation of capital. Such reserve will make for stability of income, since the beneficiary thereof will not suffer by large repairs being charged in any one year and the remaindermen will benefit because at all times there will be available a fund out of which the property may be maintained in proper manner. Both will thus benefit by constant maintenance of the premises in the best rentable condition.

There are a number of cases in New York which have recognized that in the operation of a business, mere excess of income over expenditures does not constitute net profits, and directly or indirectly approved the establishment of a reserve for depreciation. In *Matter of Jones* (103 N. Y. 621) the executors pursuant to express testamentary authority continued the operation of decedent's business. Upon their accounting they charged to income account certain expenditures for " various appliances and articles which had been worn out in the conduct of the business, as well as horses which had died ". The court held that the moneys expended to replace personal property worn out in the transaction of the business and which were essential to carry it on, were properly deducted from the income received. And in *Matter of Nesmith* (140 N. Y. 609) the trustees operated the testator's property, consisting of a warehouse, piers and wharves, as a business, in the course of which they erected a shed at a cost of $12,000, of which $7,500 was charged to income. The court in sustaining the charge said, at page 613 : " But, within the lines of a reasonable management of the trust property, whether an expenditure of the income should be made upon it, in order to perfect, or to protect, the business, was a matter for the exercise of the discretion of the trustees. The earnings of the property, which they were to account for, might well be diminished by a disbursement necessary for an improvement, which was a protection of the trust business, as a going concern, without violating the direction as to their distribution among their heirs. What the law forbids is an accumulation of either rents, profits, or income, except in the manner and for the period of time specified in the statutes. A testamentary direction otherwise is declared void. (2 R. S. 726, §§ 37, 38; Id. 773, 774, §§ 3, 4). We cannot read any such unlawful direction in this codicil. A discretionary power to make a disbursement of income, in the course of the management of the trust property, may be deemed to be within the testamentary intention, and if it is restricted to such matters as tend to preserve it, or to make it efficient for earning purposes, there can be no violation of the statute."

Again in *Thorn* v. *De Breteuil* (179 N. Y. 64) the court said, at page 78 : " The trust of this will involved, in its execution, the carrying on of the business of Garner & Co. and that management may have necessitated, probably did necessitate, the application of some of the earnings from the business to the perfecting of its earning capacity, or to its protection in various ways, and the action of the trustees in doing so, if seen to have been a

reasonable exercise of discretion, would be sustained by the courts. But that is quite a different thing from a direction to keep adding to the working capital all profits, or surplus income, not appropriated to the support of the beneficiaries.''

A number of courts of first impression in this State have dealt with the problem. The earliest case in chronological order is *Matter of Housman* (4 Dem. 404 [1886]). The testatrix had directed the conversion of her entire estate into personalty. For several years after her death the executors had rented a house together with the household furniture contained therein and had retained from the rents a sum equal to the amount of depreciation in the value of the furniture. The Surrogate directed that the decree '' contain a provision for the continued retention of the portion of the income already withheld, and for the retention, besides, of such reasonable sum out of future income as will suffice to make good the probable loss by depreciation in the value of the furniture.'' The Surrogate reasoned that the net rents, even though diminished by the amount reserved for depreciation of the furniture, still represented a larger return to the income beneficiaries '' than they would have obtained from the rents of the house unfurnished, together with the income that could have been derived from the proceeds of the furniture itself.''

The next case in New York touching upon the problem, *Matter of Chapman* (32 Misc. 187, affd. 59 App. Div. 624, affd. 167 N. Y. 619), was decided in July of 1900, and is frequently cited as denying the right of trustees to establish a depreciation reserve. The testator was a part owner in a freight vessel, which formed part of his residuary estate, the income of which was payable to his widow for life. The will authorized the executors '' to continue said investment and my estate shall receive its share of the profits and bear its share of the losses in running said boat in the same general manner as said business is now conducted.'' Upon an accounting by the executor the widow objected to the retention by him of a portion of the earnings of the vessel to form a sinking fund to provide against loss to corpus arising by the actual or probable depreciation in value of the boat. The opinion states (p. 190) that in accordance with the practice of the owners of the vessel, its net earnings were computed '' by deducting from the gross receipts every expenditure made in the running of the boat, including repairs, both ordinary and extraordinary, and in making such changes in her rig and equipment as became necessary from time to time by the exigencies of the trade in which she was engaged.'' The income

in the hands of the executor therefore reflected all of the expenditures so described by the court. The executor had from time to time set apart some portion of the income but without following any regular practice. Thus, '' In 1896 he set aside about thirty-five per cent. of the net earnings, in 1897, all, in 1898, thirty-three and one-third per cent., and in 1899 about thirty-five per cent.'' (P. 192.) The court disapproved this practice of the executor, saying at page 192: '' There is no evidence that these sums are the amounts actually lost by depreciation in those years. If the widow were chargeable with depreciation at all the amount should be accurately shown by the evidence instead of being arbitrarily fixed or guessed at. * * * The executor would probably be justified in retaining a reasonable sum in his hands out of the income from the boat to provide for emergencies in the way of repairs and current expenses, and possible losses in the business. But the fund would belong to the widow, and if it were not needed for those purposes it should be paid to her.''

Upon all of the foregoing it is evident that the decision in *Matter of Chapman (supra)* is not a precedent against a reserve for depreciation for two reasons. From the facts given it clearly appears that the necessity of a reserve fund was properly a matter for all of the owners of the vessel to determine, and that they, after deducting all expenditures for repairs, both ordinary and extraordinary, had permitted distribution of the remainder of the income without such reserve. Secondly, the court did not say that a depreciation reserve was improper as a matter of law. It did say that there was no evidence before it as to '' the amounts actually lost by depreciation '', and therefore it should not be '' arbitrarily fixed or guessed at.''

*Smith* v. *Keteltas* (62 App. Div. 174, decided in June, 1901) has also been cited many times as an authority upon this problem. In fact, the question was not before the court. The only question presented concerned the right of the trustee to use principal cash received as an award for the taking of certain buildings in condemnation for the construction of new buildings. This is made clear by the following statements of the court, at page 177: '' The fundamental question which was presented upon this trial and which is before us upon this appeal, is as to the power of the trustees to appropriate any portion of the amount received from the award to defray the expense of erecting new buildings or in restoring dilapidated buildings.''

And at page 181: '' All that has been decided by the interlocutory judgment is that such amounts as may be proved to have been paid out of the award by the trustee for legal expenses

and for the construction of buildings upon the trust estate, he should be credited with, and out of the residue of the award after deductions so made, the plaintiff is entitled to receive one-seventh, which judgment we think is right and should be affirmed, with costs.''

This court has quoted at length from *Matter of Chapman* (*supra*) and *Smith* v. *Keteltas* (*supra*) because each decision has been cited on a number of occasions as authority for a rule of law which holds the creation and maintenance out of income, of a depreciation reserve, to be improper. Close examination of these decisions satisfies this court that reference to them as precedents upon the question here under consideration is unwarranted.

In *Matter of Chapman* (32 Misc. 187, affd. 59 App. Div. 624, affd. 167 N. Y. 619, *supra*) the trust asset was unique in character, being an undivided minor interest in a freight boat. Since the decision makes clear that any income reaching the trustee was paid to him only after deduction had been made by the owners of the vessel for all repairs, both ordinary and extraordinary, it is patent that no question of the right or duty of the trustee to create a reserve for depreciation out of such net income existed. *Smith* v. *Keteltas* (62 App. Div. 174, *supra*) did not pass upon the question. The only reference in the decision to the problem before this court is found at page 180, in the discussion concerning the second argument of the appellant, that the trustee '' should, out of the income, from year to year, have expended sufficient to keep the property in a proper tenantable condition.'' All that the court said in this respect was that the trustee was not bound over a period of eighty years to '' withhold from the life tenant moneys out of the income for the purpose, *not of repair,* but of erecting wholly new buildings when those already upon the premises should, by reason of lapse of time, become incapable of further repair.'' (Italics supplied.)

In the following cases, courts of first impression have questioned the right of trustees to establish a reserve for depreciation before arriving at net income available for distribution.

In *Matter of Edgar* (157 Misc. 10 [Oct., 1935]) the will created a trust of the residuary estate for the life benefit of testator's widow. The trustees were directed to apply the net rents, income and profits to her use. The corpus of the trust included an interest in a number of parcels of real property. The trustees set aside out of income a reserve for depreciation, which was objected to by the widow upon their accounting. The Surrogate

sustained the objection for a number of reasons. He found no authority for it in the will; first, because he felt the widow was the principal object of the testator's bounty and her rights should not be cut down; and secondly, the absence of an express authorization to create a reserve for depreciation in a will containing a detailed statement of the duties and responsibilities of the trustees implied a contrary intent on the part of the testator. Nor did the Surrogate find any authority for it in law. Pointing out the respective rights and obligations of the holder of a life estate in relation to the remaindermen, he concluded that appreciation or depreciation, as the case may be, as to corpus, is inherent in the very nature of the gift itself.

In *Matter of Crimmins* (159 Misc. 499 [May, 1936]) the trustees were conducting salvage operations under the *Chapal-Otis* rules in respect to a number of parcels of real property. The Surrogate overruled an objection by a special guardian to the failure of the trustees to set up a depreciation reserve to cover obsolescense or diminution in value of buildings or equipment. He said, at page 502: " Nothing in this will indicates any intention by the testator that the life tenant should be compelled to give up some of the operating net income so as to furnish a reserve for obsolescence on buildings. On the contrary, the will shows the testator's intention to first care for the income beneficiary. Accordingly the reserve out of income is held to be unnecessary and the objection of the special guardian in respect of a reserve is overruled."

In *Matter of Adler* (164 Misc. 544 [Aug., 1937]) the residuary trusts included the stock of a wholly owned corporation which in turn held record title to a large office building. The directors of the corporation (the estate fiduciaries) continued four reserve accounts labeled " depreciation," " reserve for depreciation," " building improvement," and " reserve for building improvement " on the books of the corporation following the practice of the decedent. Except for the sum of $88,000 actually set aside out of income and invested in corporate owned securities, the reserve accounts were merely book entries. The income beneficiaries of the trust objected to the withholding of income for such reserve. The trustees argued that the reserve was unnecessary because of anticipated large expenditures for replacement of the existing elevators, for heating and plumbing repairs, for other required physical equipment and for changes in the frame of the building. The Surrogate held that the anticipated repairs did not justify the appropriation of income in advance. His comment at page 557 is pertinent: " Temporary improvements

whose probable life will not extend beyond the duration of the life interests are payable from principal but the trustees may amortize from income each year enough to secure restoration of the principal amount during the usable life of the improvement. (Restatement of the Law of Trusts, § 233, Note L.) For such temporary improvements the amortization should not commence until the expenditure is actually made. The life tenants here are entitled to the benefit of the remaining life of the elevators presently in service. If and when new elevators are installed the life tenants through the permissible amortization will be paying each year for the benefit received. If they should die before the usable life of the new elevators has expired the remaindermen will receive the benefit of the balance of their usable life and should pay therefor.''

In *Matter of Danziger* (58 N. Y. S. 2d 790, mod. on other grounds 271 App. Div. 888) Surrogate SAVARESE, citing the *Smith* v. *Keteltas, Chapman, Edgar* and *Adler* decisions (*supra*), held that rents of real property could not be charged with a reserve to meet depreciation of real estate as against the income beneficiary of the trust. Examination of the record on appeal discloses that no appeal was taken from the ruling upon this question. (See, also, *Matter of Hubbell*, N. Y. L. J., Feb. 11, 1948, p. 554, col. 7, and *Matter of Wadsworth*, 81 N. Y. S. 2d 298 [April, 1948].)

This court does not agree with *Matter of Adler, Matter of Edgar, Matter of Crimmins* and *Matter of Danziger* (*supra*), insofar as they denied the right of the trustees to withhold income and create a reserve account in order to meet the cost of anticipated future repairs. It is the opinion of this court that unless the trust instrument otherwise expressly provides the trustees are not only permitted, but required to set aside from gross rents received, a fund which may be used to preserve the corpus of the estate intact for the benefit of the remaindermen, whether the trust asset be what is commonly known as a wasting asset, or real estate, which differs therefrom in degree only, and not in kind. It is immaterial whether that fund be called a depreciation fund or otherwise.

The gross rents received from real estate are paid for the use and occupancy of the premises and until all of the current expenses for taxes, interest, insurance and ordinary repairs are paid and a reasonable provision made for preservation of the building, for anticipated future repairs or depreciation, there is no net income available for the income beneficiary. The rent paid by the tenant or occupant of the premises includes all of

these items. The amount he pays covers the ordinary wear and tear on the premises. This fact is recognized by the economists as well as in the income tax law and is in accord with the obligation of the trustee to preserve the principal for the remaindermen as well as to provide income for the income beneficiary.

If no provision is made for future repairs or depreciation then the income beneficiary is benefited at the expense of the remaindermen. The trustee is under obligation to maintain the property during the life of the trust in rentable condition. There are many items of such maintenance that do not recur annually but over five- or ten-year periods. If the cost of such items are charged when incurred then the income of the beneficiary will be subject to violent fluctuation. A fixed rate of reserve provides a fund out of which large repairs can be borne and still provide a stable return to the beneficiary.

In general, the text writers look with favor upon a reserve for depreciation. (See 2 Scott on Trusts, § 239.3; 60 Harv. L. Rev. 952; 47 Yale L. J. 1026; 85 Journal of Accountancy 320.) Note should also be made of the fact that upon a sale of the real property, in computing gain or loss, the cost basis must reflect depreciation, whether taken or not. (Internal Revenue Code, § 113, subd. [b], par. [1]; U. S. Code, tit. 26; Tax Law, § 360, subd. 8.)

There are a number of reported decisions in the Federal courts which have indirectly concerned themselves with the problem. (See *Hubbell* v. *Burnet*, 46 F. 2d 446; *Freuler* v. *Helvering*, 291 U. S. 35; *Laflin* v. *Comm.*, 69 F. 2d 460; *United States* v. *Blow*, 77 F. 2d 141; *Chisholm* v. *United States*, 19 F. Supp. 274; *Commissioner of Internal Revenue* v. *Gutman*, 143 F. 2d 201.) Each of the cited cases concerned income tax liability. In each instance the claim of the taxpayer in respect to deductions for depreciation was judged in the light of what the court conceived to be the right of the taxpayer under the particular trust instrument or the applicable State law.

The problem has also arisen in other jurisdictions and has reached the appellate courts in some of these States. An interesting discussion of the question is found in *Matter of Matthews* (210 Wis. 109 [Nov., 1932]). In that case the testator died in 1913. He bequeathed " the use and net income of the remainder of my shares  *  *  *  of said Matthews Building Company " to a brother and two sisters, and to the survivors and survivor, and upon the death of the survivor, to four designated charities. Matthews Building Company purchased real estate known as the Matthews Building for $240,000. The business of the

company consisted of operating the " Building " and its only income was the rentals received therefrom. After paying expenses of operation, including charges for depreciation, all of the net income was disbursed from time to time in dividends to stockholders. The " Building " was sold in 1922 for $1,300,000, at which time the depreciation reserve account amounted to $35,686. Upon the sale of the " Building " the company liquidated its assets. The trustee received by way of liquidating dividends its share of the depreciation reserve account in the sum of $9,111. Upon the accounting by the trustee following the termination of the trust in 1927, the trial court held that the share of the depreciation reserve account received by the trustee on final liquidation was income. The appeal was taken by the remaindermen. The appellate court refused to answer the question directly. However, it approved the practice of charging depreciation to income, saying, at page 114: " The testator provided that the life tenant was to have ' the use and net income ' of the shares. In determining net income, sound accounting practice requires a withholding of some part of gross income on account of depreciation, the theory being that it is necessary in order to preserve intact that part of the corpus upon which it is computed. If some part of the corpus is in fact consumed in the operation of earning the income and the income is paid out in dividends without any deduction therefrom, a part of the dividend at least would represent corpus." However, the court did not deem the reservation of income in a depreciation reserve account decisive of the rights of the parties. It said, at page 115: " The ultimate question is, Did the income so withheld lose its character as income and, if so, when and how? There is in this case no showing that the building had in fact depreciated in value. There is no claim that any part of the fund had been in any way applied other than by setting it up on the books. It is considered that this is not sufficient to deprive the fund of its character as income. It being current income, it remained income although not distributed by way of a dividend until there was an actual or a constructive incorporation of the fund in the corpus. The sum could not be withheld from income for the purpose of adding it to the corpus but only for the purpose of maintaining or to that extent restoring it."

The court's conclusion appears to have been prompted mainly because the building had in fact increased rather than diminished in value. It held that the fund remained income, and accordingly affirmed the judgment.

In *Matter of Roth* (139 N. J. Eq. 588) the point under discussion was considered by the appellate court although the appeal was taken apparently only from the refusal by the lower court to vacate three decrees settling prior accounts of the fiduciary. The cause assigned for vacatur of the decrees by the income beneficiary was the making of amortization payments on a certain mortgage out of income. Although shown in the accounts, no objections had been made to the payments. The decrees were set aside upon the appeal. The remaindermen urged that on resettlement of the accounts, a depreciation reserve be created. This the court declined to do, although admitting that " Such a course is in harmony with modern accounting practice ". It reasoned that " A tenant for life is bound to repair only to the extent of preventing permissive or actual waste. * * * he is under no obligation in respect to the loss of economic value of a building which normally occurs."

A decision containing many similar aspects to the matter before the court, is found in *Fidelity Union Trust Co.* v. *McGraw* (138 N. J. Eq. 415 [Aug., 1946]). There the testator, who was survived by a widow and three children, set up identical trusts for the latter terminable on the death of the survivor of the three, remainder to grandchildren, per capita. The will expressly authorized the trustees, in respect to real property " to make such provision for deterioration and obsolescence " with respect thereto, as in their judgment might be wise. The corpus of the trust included a substantial piece of real property in the city of Newark upon which was erected a building containing a theatre and a number of stores. In an action for construction and instructions, the court was asked whether the complainants were authorized out of the net annual income of the property to " create a sinking fund to recover deterioration and obsolescence of the property and so preserve intact the physical and economic integrity of the trust corpus?" The court found that the testator intended to authorize the complainants to do that for which they sought approval. Moreover it said, at page 421: " The propriety of creating such a fund is recognized by the authorities. 2 Scott on Trusts, § 239.4; *De Rose,* (1940) 1 D. L. R. 139. This is particularly true where a business is conducted on the premises held in trust, Cf. *Matter of Jones,* 103 N. Y. 621." (Cf. *Chapin* v. *Collard,* 29 Wn. [2d] 788; *Evans* v. *Ockershausen,* 100 F. 2d 695, certiorari denied 306 U. S. 633.)

It thus appears that the cases in other jurisdictions are inconclusive and do not establish a rule of law sufficiently well settled

to constitute a property right. The basic search in testamentary interpretation has always been the unfolding of the intention of the maker of the instrument. The foregoing cases merely illustrate that concept. Most of the decisions have rested upon the court's understanding of the testator's purpose and wishes. The reference to an established rule and to decided cases has merely served to bulwark a result already determined upon the manifest intent of the testator.

The court accordingly holds that trustees not only may, but are bound to set up a reserve out of income for depreciation of the buildings embraced in the corpus of the trust. The reserve fund is to be created by a charge to gross rents received conforming to testator's practice in filing his income tax returns. Such funds are not irrevocably allocated to corpus. The disposition of such reserve fund as between income and principal is expressly reserved for determination until such time as the trust has terminated, or upon an earlier application when the facts shall warrant such determination.

In referring to depreciation, and a depreciation reserve, this court is limiting its decision to physical and material depreciation and obsolescence as distinguished from economic depreciation. Depreciation or appreciation resulting from economic factors or changes in neighborhoods, apart from physical wear and tear and obsolescence, must be borne by and enure to the benefit of the remaindermen.

While in reaching this conclusion the court has referred to the language of decedent's will and the fact that he was engaged in his lifetime in the erection and operation for investment purposes of multiple-family dwellings, the obligation and right to charge depreciation against gross rents is not dependent either upon the wording of the will or trust instrument, or the nature of the business in which decedent was engaged. In the absence of a definite direction to the contrary it is the fiduciary's duty to establish such a depreciation reserve.

Submit decree on notice in accordance herewith.