In the Matter of the Estate of SAMUEL W. ADLER, Deceased.

Surrogate's Court, New York County, August 23, 1937.

L. & A. U. Zinke [*Alexander U. Zinke* and *Charles W. Silver* of counsel], for Fanny Adler and Anna L. Schram, petitioners, and for Cyrus Adler, trustee.

*Jackson, Fuller, Nash & Brophy* [*John G. Jackson* of counsel], for Diana Adler Hirshfeld, trustee.

*Edmund M. McCarthy*, special guardian for infant.

DELEHANTY, S.   Deceased died on November 7, 1927.   His will, which was admitted to probate on November 26, 1927, appointed his widow, Diana S. Adler (now Hirshfeld), and his brother, Cyrus Adler, executors and trustees.   One-half of deceased's residuary estate was bequeathed in trust for the life of his widow, and she was given the right to dispose of the corpus thereof by will. Three-eighths of the residuary estate was bequeathed in trust during the lives of the brother, Cyrus, and Freda Baer, a sister, with directions to the trustees "to take possession thereof, care for and manage the same; to invest and reinvest the same and to receive and collect the rents, interest, dividends, profits and income

therefrom, and after paying all of the lawful expenses and charges of said trust, to pay all of the net income of said trust " to Fanny Adler, deceased's mother. Upon her death the income was directed to be paid in equal parts to Cyrus Adler and Freda Baer and all of the net income to the survivor of them. The remainder interest of this trust was bequeathed to the widow, to a brother Eugene Adler, and to Arthur B. Baer, a nephew, or the survivor or survivors of them. The remaining one-eighth of the residuary estate was bequeathed in trust during the lives of Eugene Adler and Anna Schram, another sister, with directions to pay the income to such sister during her life and upon her death to pay the income to Eugene Adler. The remainder interest of this trust was bequeathed to Freda Baer and Cyrus Adler in equal parts or to the survivor of them, or, if neither is living at the termination of the trust, to the widow and Arthur B. Baer.

On September 29, 1931, the executors and trustees filed an account which was settled by decree dated March 15, 1932. The gross estate was valued in that proceeding at an amount in excess of $2,260,000. Among the assets listed as having been received by the executors were 100 shares of the capital stock of Relda Realty Corporation, having an appraised value of $389,463.34, and 1,250 shares of the capital stock of Delmar Investing Corp., which was stated to be without value. Listed also as assets of the estate were a debt of $128,507.75 due on open account to deceased from Relda Realty Corporation and a debt of $115,796.87 due deceased from Delmar Investing Corp. A schedule showing changes in investments resulting in no loss or gain of capital lists a total amount due from Relda Realty Corporation during the period of the account of $220,507.75. This total was made up of $128,507.75, the amount of the debt as shown on the books of this corporation at deceased's death, plus advances of $92,000 made by the executors to the corporation after his death. Payments by the corporation of $195,507.75 are stated in the same schedule of the account to have been made, leaving a balance due at the date of the account of $25,000. Interest payments of $21,345.44 on this indebtedness are included in the income schedules of the account. These interest payments seem to cover the original debt and the advances of the executors. Payments of $25,296.87 are shown as having been made in discharge of the debt of Delmar Investing Corp., leaving a balance due of $90,500. Interest amounting to $1,610.12 paid on this debt was also included in the income schedules.

The executors took credit by transfer to themselves as trustees of the residuary trusts for $389,463.34, the original inventory value of the 100 shares of Relda Realty Corporation; for $25,000,

the balance of the debt of that corporation, and for $90,500, the balance of the debt of Delmar Investing Corp. Apparently there was allocated to each trust a proportionate interest in each of these three items. The account indicates that the debts owing from the corporations and the stock in the corporations were dealt with by the executors and trustees as separate and distinct, and were so catalogued as assets of the estate and trusts. The interest paid on the debts was treated as income distributable to the life beneficiaries of the trusts. No question was raised in that 1931 accounting concerning the transactions therein reported. On October 27, 1931, the moving parties here executed waivers of citation and consented to the settlement of the account, which was filed on September 29, 1931.

The present proceeding was instituted by Fanny Adler and Anna Schram as income beneficiaries under the will. They ask that the will be construed, that the waivers and consents executed by them in the accounting proceeding be declared void and of no effect, that the decree settling the account be vacated and set aside, and that they be given leave to file objections to the account. They ask also that the executors and trustees account for their acts with relation to Relda Realty Corporation. The relief sought is demanded on the ground that the acts of the executor and trustees in the handling of deceased's interests in Relda Realty Corporation and Delmar Investing Corp. were illegal and improper and have resulted in detriment to the rights of the income beneficiaries under the will. The facts in relation to deceased's interest in Delmar Investing Corp. have not been devolped. The parties agreed that inquiry as to that corporation and the acts of the executors and trustees respecting it should be deferred until after determination of the controversy respecting the affairs of Relda Realty Corporation and the rights of the parties in the income thereof. The decision here made is not intended to apply to any transaction concerning Delmar Investing Corp.

Relda Realty Corporation was organized by deceased some years prior to his death for the purpose of acquiring title to and undertaking the erection of a twelve-story loft building on premises 423–439 West Fifty-fifth street, borough of Manhattan, city of New York. At deceased's death the land and building were valued at $865,000 and were subject to a first mortgage of $325,000. Deceased was the owner of the entire capital stock. At his death the books of the corporation carried an account in his name in which at that time was a credit balance in his favor of $128,507.75. This is the item which the executors and trustees have treated as a capital asset of the estate. By reason of their ownership of the

entire stock of the corporation the executors and trustees controlled the board of directors of the corporation. The directors of the corporation authorized the corporation to discharge the debt by payment thereof to the executors and trustees. Payments aggregating $103,507.75 and interest are shown in the account. Admittedly the payments in reduction of the debt were made wholly from income earned by the corporation which it derived from net rents of the building owned by it. Subsequent to the decree in the accounting the corporation paid to the trustees from the same source the sum of $25,000 remaining due on the debt when the account was settled by decree. The total sum of $128,507.75 so paid is conceded to have been invested by the trustees and the investments carried as principal assets of the trusts. The shares of the corporation are likewise so carried.

The account does not detail the receipts and disbursements of the corporation nor does it indicate the source of payments made by the corporation to the executors and trustees in partial discharge of the debt on its books in deceased's favor.

Understanding of the whole problem requires reference also at this point to the fact that during the year following deceased's death and each year thereafter the directors of the corporation made charges against accounts designated on the books of the corporation as " depreciation," " reserve for depreciation," " building improvement," and " reserve for building improvement." Of the amounts so charged to these accounts there was actually set aside from earned income and invested by the corporation for its own account the sum of $88,000. This sum is said to equal the amount allowed by the Collector of Internal Revenue as a credit against gross income on the corporation's tax returns. During deceased's lifetime similar charges were made in these same accounts but no part of the amounts charged therein was actually set aside in cash or securities. The account does not include any information indicating that the directors had set up out of income a reserve from year to year for depreciation and improvements of the real estate.

Petitioners assert that deceased intended that they should have the full net income from rents received by the corporation without deduction for payment of the debt to deceased shown on its books and without deduction for depreciation and improvements, that the executors and trustees when acting as directors must find authority for their acts as directors in the will, that they are required to account to the life beneficiaries for such acts, that the legal fiction of separate entity should be disregarded since such disregard is necessary to carry out this intention of deceased, that in the circumstances here the former decree is not *res adjudicata*

on the questions in controversy, and finally, and as a consequence of correct accounting, that there should be distributed to them as income the payments made out of the income of the corporation on account of the debt of the corporation and the amount set aside out of income as a reserve for depreciation and improvements. The widow, individually and as executor and trustee, asserts that no question of testamentary intention is involved, that the acts of the executors and trustees in their capacity as directors cannot be dealt with as if acts in the capacity of executors and trustees, that the corporate entity may not be disregarded and that the former decree is *res adjudicata* at least as to the payments covered by it. She asserts that the acts of the directors in setting up a reserve were fully justified in any event.

There is controversy whether the reserve for depreciation and improvements was necessary. Petitioners and Cyrus Adler, one of the trustees, contend that deceased in his lifetime wrote off as a book item about $10,000 a year without any statement on the books of the corporation of any specific purpose and that the executors and trustees followed the same practice but actually set aside funds. The widow contends that the reserve was established for legitimate corporate purposes. She alleges in her answer that in 1940 it will be necessary to replace the existing elevators at an estimated cost of $84,750, that expenditures for heating and plumbing will be $4,300, that during the twenty-one year period commencing in 1930 other physical equipment will have required the expenditure of $41,500, that it may be necessary to strengthen the frame of the building to meet the need of the tenant having the largest space, and that it may be necessary to pay some part of the principal of the mortgage of $325,000. She also alleges that the income paid to the beneficiaries since deceased's death has been substantial and that petitioners have not been prejudiced by the setting up of the reserve for depreciation and improvements. There is no evidence before the court as to whether it will be necessary to make the expenditures for which the widow claims the reserve was set up and no ruling can be made on the basis of such fact allegations. The court may nevertheless rule upon the rights of the income beneficiaries assuming the facts to be as stated.

A hearing was had on the question whether or not basis existed for a finding on the facts that the waivers and consents of petitioners should be declared of no effect and set aside because of the circumstances attending their procurement. The instruments were presented to petitioners by Cyrus Adler, one of the executors and trustees who, petitioners allege, made the statement to them that he was advised by counsel for the executors and trustees that the

execution thereof was required by formal legal procedure and that the provisions of the will of deceased were being properly carried out according to the advice of such counsel. The age of one petitioner and the dependence of both on what was told them because of their lack of business experience are urged as factual reasons for setting aside the instruments particularly since they were procured by a trustee who in some contingencies might profit by approval of the account as filed. The court holds on the proof presented that this trustee acted in entire personal good faith and without any thought of personal gain in obtaining the consents and waivers. But notwithstanding this finding of actual good faith the court is of opinion that the decree on the accounting may be modified and the waivers and consents held not to bar re-examination of the allocation of income of the estate and of the corporation wholly owned by it.

The account ignores the operations of Relda Realty Corporation. In some aspects the account is insufficiently informative and at least in one schedule is misleading. Since no one suggests that petitioners had any actual knowledge of the account or its schedules it follows that any infirmity or omission in the account must be given full weight in fixing petitioners' rights. They are to be held to know only what clearly they would have seen if they looked at the account. Confessedly the executors and trustees made several errors in the account. Their own amending affidavit points out some. The report of the special guardian points out others. Even with the changes thus indicated the account is neither correct according to good accounting practice nor does it state the transactions of the executors so they can be understood. The finances of the estate can be comprehended only by indulging in inference. The chief error and omission relates to the very item which is here in controversy. A brief recital of the form of the account will aid in understanding its defects.

The opening schedule is headed " Inventory " and lists the capital assets coming originally into the hands of the executors. Among these are " 100 shares of Relda Realty Corporation, $389,-463.34," and " Debt due from Relda Realty Corp. (open account) $128,507.75." The next schedule is headed " Additional receipts of capital." In most instances the items in this schedule appear to belong in the prior schedule since they apparently relate to uncollected interest or dividends due at the death of deceased on securities listed in the inventory. The last item in this schedule is the amount refunded by the State of New York because of excess initial payment of death taxes. Plainly such a refund is not an increase of capital. It operates merely to reduce credit for

outlay. The next schedule is headed "Receipts of income" and consists of eight pages of detailed report by date and amount of interest and dividends received on estate assets. On the last sheet of this eight-page schedule are two items referring respectively to interest on a $64,000 block of New York city *fours* bought on February 5, 1931, and interest on a block of $32,000 State of Louisiana four-and-one-half's with date of purchase not specified. Comment will be made later on these items. Then follows a schedule headed "Changes of investment involving increase and decrease of capital." The items here are set out in such fashion as to emphasize only a *net* change in the money value. In one item the important fact of essential change in the character of the estate assets is noted but only for the purpose of recording what is called a "loss" of $155. Plainly this is no "loss" at all since it represents the cost of transfer stamps on the exchange of securities and the loss or gain in the transaction can be known only by knowing the value of the securities received in exchange. These are reported merely in gross and at the value of the former security. Separate valuations of the separate securities so received in exchange should have been stated. The next schedule is headed "Expenses of administration a/c Capital." Here is found the overpayment of death taxes which resulted in the refund which is called an "Additional receipt of capital" in the second schedule. Next is a schedule called "Doctors and funeral expenses a/c Capital." Next is a schedule headed "Debts." Then follows a schedule "Expenses of administration a/c Income." Next are three schedules showing respectively capital payments to the Lillian Adler trust, to Diana Adler outright and to the trustes in which petitioners are interested. Then follows a schedule showing payments of income to legatees. Next follows the schedule in which the Relda debt is dealt with. It requires extended comment.

The schedule is headed "Changes of investment involving neither increase nor decrease of capital." In this schedule the transactions of the executors with cash assets of the estate in respect of the Relda debt are listed for the apparent purpose of showing only the balance of $25,000 still due on that debt on June 30, 1931. (The account was filed in September, 1931.) It is not without significance that the executors dealt with the corporation as if integral with the estate. They advanced to it a total of $92,000 out of the cash of the estate. The in and out cash transactions show, when studied carefully, that not until February, 1931, did the executors get *and keep* any large sum in reduction of the debt. The schedule contains two items which *probably* are related to this debt payment though they are not so stated. The schedule

recites an investment on February 15, 1931, of $64,000, and on February 18, 1931, of $32,000, in certain bonds. Payment on the debt was made on February 13, 1931, in the sum of $80,000. The bonds are listed in the schedule as if purchased on the basis of exact par in each case though the income schedule under dates of April 1 and June 1, 1931, show that capital cash must have been used in the respective sums of $960 and $256 to cover interest accrued to date of purchase. If *any one wanted to know whence came the money which Relda used to pay its debt and to know to what use the executors put the $103,507.75 which they collected he could not find out from the account. All that he could find from the account is that the new securities must have been bought with capital cash derived from some source and probably from the debt payment.* Even if the account had shown the receipts and disbursements of the executors for capital account as the transactions occurred there would still be lacking any report of the *source* of the debt payment. It might have been the case that Relda Realty Corporation used some *capital* asset to make the payment. In these circumstances the decree of 1932 is not *res adjudicata.* (*Matter of Denbosky,* 245 App. Div. 93; *Matter of Jackson,* 258 N. Y. 281; *Donahue* v. *New York Life Insurance Co.,* 259 id. 98; *Matter of Long Island Trust Co.,* 179 id. 520; *Matter of Droney,* 231 App. Div. 674; *Matter of Fuller,* 227 id. 801; affd., 254 N. Y. 519; *Matter of Hodgman,* 82 Hun, 419.) There can be no doubt that the depreciation and improvement accounts are still subject to question by the life tenants. They were not stated at all in the account and their existence could not even be guessed from its text. No report having been made of the operations of Relda Realty Corporation in the account, neither the extent of its net income nor the disposition thereof was disclosed to the life tenants. They are entitled now to assert any right inuring to them because of that income.

The question being wholly open and the decree not operating as a bar the court must determine what petitioners' rights are on the facts conceded. Deceased as owner of the corporate stock could do with the income of the corporation what he pleased so long as he observed the rights of its creditors other than himself. Assuming the corporation to be solvent and to be without debt except to deceased, it is apparent that essentially he owned *the net worth of the corporation's assets.* If he choose he could reduce them to his possession by enforcing his creditor right or by enforcing his stockholder right or by doing both. In like manner he could make disposition of its income as he chose. He could pay the principal of the debt or he could pay interest only on it or he could ignore it and pay out all income as dividends or he could accumulate

the income in the corporate treasury. When he died his executors became possessed of all that he had as the capital of his estate. For reasons based in part on their fiduciary status and in larger part on the public policy of the State they functioned under rigid restrictions as to their use of the income of the corporation.

The executors, properly enough perhaps, continued the corporate structure and maintained both a creditor and a stockholder status in respect of it. There might well be occasions where the mere stockholder position would be inadequate to protect estate assets. In the case of an insolvent corporation the creditor position might alone be productive of value since the shares might be worthless except as the means of control. *Per se,* the collection of the debt here might have been appropriate. If for instance, the corporation had sold its land and building and received in cash enough to pay the debt the use of the sale proceeds for that purpose would not be assailable. In such case neither the State nor the beneficiaries could complain. No public policy would have been violated and no private rights discriminated against. When, however, income of the corporation is used to pay the debt, as here was done, two objections are validly made.

The primary objection is based on the public policy of the State. What deceased could have done legally his representatives are forbidden to do. The dead hand of the testator may not direct accumulation of the earnings of his estate except for a minority. His executors, *a fortiori,* may not do what he is forbidden to direct in accumulating income. That an accumulation has been effected by the executors and trustees cannot be denied. They *received* (a) the shares of a corporation *burdened* with a debt and (b) the debt. They *now* have the shares *free* of the debt and the value of the debt as well. The shares *originally* represented an equity in an improved parcel of real estate, but the share value was *diminished* by the amount of the corporate debt. The shares *now* represent the same equity in the same real estate and their value is *undiminished by any debt.* The executors hold in the capital of the trusts cash or securities as the equivalent of the corporate debt which they collected out of income *and* the shares which have a *larger* value, larger by the amount of the debt from the burden of which the shares are freed. By dint of accumulating income the capital of the estate as now reported by the trustees has increased by the amount paid on the debt. If the executors had received the same real estate by reason of deceased dying while personally the record owner it would not be argued that what has here been done by them could be defended. Does the corporate existence justify the result here defended by deceased's widow?

The nature, the powers, the immunities, the duties and the functions of the thing called a corporation have intrigued the thought and attention of thousands whose views are to be found in opinions in adjudicated cases, in law reviews, in monographs and in ponderous texts of many volumes. The metaphysician, the theorist and the practical man have all had their audiences. Their debates about " abstraction," " fiction," " entity," " aggregation," " association," " fictitious entity " and the like give little aid to the *nisi prius* judge who over months of reading might seek unavailingly for a rule of decision applicable to the case of corporations controlled by fiduciaries. Such a judge would be prone to say with the Tentmaker that he " did eagerly frequent doctor and saint (the pundits of the law reviews) and heard great argument about it and about but evermore came out by the same door wherein (he) went."

In dealing with business corporations courts have been prone to say that in business matters they will not undertake to substitute the judgment of the court for that of the directors. This practical recognition of the separateness of the corporation has given rise to many of the assertions that the intra-corporate acts of fiduciaries who are directors cannot be reached effectively by the courts charged with regulating fiduciary action. The instances in which corporate action has been influenced if not directly controlled by the exercise of control of the fiduciary in his latter capacity seem to be accompanied by labored effort to deny direct interposition in the corporate affairs. In the circumstances here present the court sees no reason why the parties interested in the effect produced by corporate action may not obtain court aid even to the extent of an order explicitly commanding particular corporate action. What need is here present for maintenance of separateness of corporate identity? The statutes of the State forbid accumulation. The rights of the income beneficiaries require protection. How are the statutes to be enforced and the legatees' rights protected except by command of the court that particular corporate action be taken? Who can object to such command? The remaindermen? They are not the corporation. They are not entitled to benefit by corporate action which works a defiance of State policy against accumulations. Their *capital* interest in deceased's estate is not infringed by court direction that *income* be distributed as such by the corporation. Is the corporation prejudiced? What is *this* corporation? Is it any more than a repository for assets which for the enforcement of the policy of the State and the protection of private right must be dealt with as if

owned in deceased's name? What public policy respecting corporations or what private right would suffer if this court acted within the power granted by section 40 of the Surrogate's Court Act and directed specifically what the fiduciaries should do as directors? Must the court ignore the patent fact that fiduciaries may seriously affect private rights by directorial action? The court holds that in cases where the entire corporate stock was owned by deceased and by his death passed to his fiduciaries it has the power through orders to the fiduciaries to direct corporate action by them to the extent necessary to adjust the respective rights of remaindermen and income beneficiaries and to the extent necessary to compel observance of the State's policy against income accumulations. To illustrate: The court holds that on proper application by an income beneficiary made prior to any payment on the capital of the debt the court would have been authorized to direct the fiduciaries to pay such debt only out of capital assets of the corporation and to pay out the net income of the corporation to themselves as fiduciaries so that it might in turn be distributed to the income beneficiaries. Possessing that power prior to the payment on the debt, the court asserts the power *now* to correct the erroneous action of the fiduciaries in their directorial capacity and to transfer from capital account to income account of this estate the whole sum paid out of corporate income in retirement of the debt.

Every fetish of non-intervention may be observed yet the same result will follow under rulings which fit the facts here. The terms of his will indicate the intention of deceased to deal with the real estate in the corporation as though it were owned by him individually. As stated the corporation owns only the single parcel of property and deceased owned all the stock. The will directs the trustees to take possession of the residue, to care for and " manage " the same. They are directed " to receive and collect the rents, interest, dividends, profits and income." They are given the authority in paragraph eighth of the will to receive in kind from the executors any investment in real or personal property, and in paragraph ninth to sell, manage, dispose of, mortgage or lease any or all of deceased's real or personal estate. The intention of the testator will govern over forms employed by him in the way of corporate organization. (*Matter of Jackson*, 258 N. Y. 281, 287.) Trustees as directors hold dual trust positions. (*Matter of Auditore*, 249 N. Y. 335.) As trustees they derive their power from the will (*Matter of Kellogg*, 214 N. Y. 460), and hence the beneficiaries may require them to account for their acts as directors

and surcharge the trustees for any loss occasioned the beneficiary by abuse of power by the trustees. (*Farmers' Loan & Trust Co.* v. *Pierson,* 130 Misc. 110; *Pyle* v. *Pyle,* 137 App. Div. 568; affd., 199 N. Y. 538.)

Here there was plain abuse of power by the executors and trustees acting as corporate directors. For all corporate purposes the corporation may doubtless convert earnings into capital if such power is conferred by its charter. But when the question arises between life tenants and remaindermen concerning ownership of the earnings thus converted, the action of the corporation does not conclude the courts. In a case where a stock dividend was declared which involved the addition of earnings to capital the court said that the rights of life tenant and remainderman did not depend on the action of the corporation and that the court could look at the real nature and substance of the transaction. (*McLouth* v. *Hunt,* 154 N. Y. 179.) This seems also to be the principle underlying the decision in *Matter of Osborne* (209 N. Y. 450). Under these cases if the trustees here had as directors declared a stock dividend out of earnings and thereby added earnings to the capital of the trusts and had then paid off the debt out of cash thus added to capital their action would not have affected the life tenant's right to the stock dividend. No different rule should apply when the earnings are indirectly added to capital by paying off a debt. Under the authorities cited the entire amount paid on the debt is income payable to the income beneficiaries. No interest will be allowed since the beneficiaries have had the interest from the the investments made.

On the books of the corporation are four reserve accounts already listed hereinabove. These reserves are still mere book entries except for $88,000 which is the amount actually set aside in cash and now represented in corporation owned securities. All of this investment was set up out of income. It all belongs to the income beneficiaries. The remaindermen have no valid complaint nor can they defend the claim that they are entitled to recapture either land cost or building cost at the expense of the income beneficiaries. If the building and land eventually passing to them suffers depreciation during the life of the trusts that is a result which was envisaged by the testator. Mayhap they will benefit by accretion of value due to external effects such as surrounding improvements. Whatever the result they must accept it. The reserve cannot be justified for prospective use. The mortgage payment suggested as a proper use of the fund is forbidden. Deceased could not direct such use. (*Hascall* v. *King,* 162 N. Y. 134; *Appell*

v. *Appell*, 177 App. Div. 570; affd., 221 N. Y. 602.) His executors and trustees cannot. The suggested need for new elevators and for strengthening the frame of the building and the like will not justify the appropriation of income in advance. Permanent improvements are payable from capital only except in the case of wasting assets. (*Smith* v. *Keteltas*, 62 App. Div. 174; *Matter of Edgar*, 157 Misc. 10; *Matter of Chapman*, 32 id. 187; affd., 59 App. Div. 624; *Matter of Trimbey*, 138 Misc. 662; American Law Institute, Restatement of the Law of Trusts, §§ 233, 239.) Even in the case of wasting assets no amortization is permitted if the intention of the testator is otherwise. (*Matter of Hall*, 127 Misc. 238. See, also, *Frankel* v. *Farmers' Loan & Trust Co.*, 152 App. Div. 58; affd., 209 N. Y. 553.) Temporary improvements whose probable life will not extend beyond the duration of the life interests are payable from principal but the trustees may amortize from income each year enough to secure restoration of the principal amount during the usable life of the improvement. (Restatement of the Law of Trusts, § 233, note L.) For such temporary improvements the amortization should not commence until the expenditure is actually made. The life tenants here are entitled to the benefit of the remaining life of the elevators presently in service. If and when new elevators are installed the life tenants through the permissible amortization will be paying each year for the benefit received. If they should die before the usable life of the new elevators has expired the remaindermen will receive the benefit of the balance of their usable life and should pay therefor.

The trustees will be required to file schedules showing the operations of Relda Realty Corporation. The parties on October 4, 1937, at four-thirty P. M. may confer with the court on the required extent of such schedules and on the need for further proof in respect of Delmar Investing Corp. Proceed accordingly.