S. Samuel Di Falco, S.
The testator created four separate trusts, in each of which, after payment of specific sums to others, his widow is beneficiary of one third of the balance of the income and one of his four children is beneficiary of the remaining two thirds. The objeetant, Harry C. Schnur, is one of the four children and is entitled to two thirds of the remaining income of one of the four trusts. There are no objections filed to the accounting of the other three trusts. The objeetant filed two separate objections to the account, but in reality they constitute a single objection to the failure of the trustees to distribute to the trusts earnings of a wholly-owned corporation which the objeetant contends should have been distributed by the corporation to the trustees and by the trustees to the income beneficiaries.
All of the issued shares of stock of Madison Tower Corporation, a New York corporation, had been owned by the decedent up to the time of his death on March 16, 1948. All of the shares were bequeathed to the trustees of the four trusts, the trust in which the objeetant is interested receiving 25% of the shares. The principal asset of that corporation is a building located at 152 Madison Avenue in the Borough of Manhattan. The corporation also holds cash and two small properties. During the decedent’s lifetime, the corporation did not pay dividends. Thereafter it paid dividends in the years prior to 1959, but made no distribution of dividends in 1959 or since that time. The accounts of the trustees were judicially settled up to May 31, *882 1958, the present account covering the period from the date to April 2, 1961.
The objectant’s case is built upon the increasing reserves maintained by the corporation. The retained earnings of the corporation as of March 31, 1948 (two weeks after decedent’s death) amounted to $89,115.21. As of that date the depreciation reserve for the Madison Avenue building was $97,431.15. The corporation at that time owned another building on East 56th Street. The surplus of the corporation at the opening date of the present account was approximately $250,000 and on January 1, 1963 was $312,333. It has been the regular practice of the corporation, prior to the decedent’s death and thereafter, to allocate a portion of the annual earnings to a reserve for depreciation. The surplus stated above represents sums set aside after the deduction of depreciation reserves. The depreciation reserve on the main building, as of December 31, 1962, had grown to $290,220.40. The cash on hand as of April 2, 1961 (the closing date of the account) was $173,448.81. Prior to 1958, a portion of the surplus had been invested in bonds, but these investments were liquidated and approximately $137,000 of the proceeds were invested in two parcels of real property. The objectant contends that in purchasing additional realty, the trustees are permanently reinvesting moneys which should be distributed as income to the beneficiaries of the trusts. He challenges the right of the trustees to maintain the increasing reserves, and contends that the earnings should be distributed to the income beneficiaries.
The shares of stock of Madison Tower Corporation are not the principal asset of this trust. The account now on file, covering a period of less than three years, reports a total distribution to all income beneficiaries of this one trust of more than half a million dollars. Of this sum, the objectant has received income totalling $378,949.93. The reason for the investment in the two small parcels of real estate is that the corporation had been notified by the State Tax Commission that more than 10% of its total assets consisted of stocks or bonds, and that if the average investments during the calendar year 1958 should exceed 10% of the average gross assets, the corporation would lose its tax status and would automatically become taxable under article 9-A of the Tax Law. Upon receipt of the notice from the Tax Commission, the corporation sold bonds and invested approximately $137,000 in the two properties in order to preserve its favorable tax status. There was no intent to make any permanent transfer of earnings to capital but rather to hold the two parcels under the same conditions as the corpo *883 ration held the bonds or the cash reserve. The trustees have pointed out to the court and to the objectant that the trustee directors have operated the other estate-owned corporations for the benefit of all parties, income beneficiaries and remaindermen, and eventually have allocated all proceeds so that the income beneficiaries received all accumulated earnings. In the petition for the judicial settlement of the pending account they request the Surrogate to instruct them with respect to the allocation of the proceeds of another of the corporations which is being-liquidated. The distributions of accumulated reserves of income serve to explain the very large payments to the income beneficiaries. The trustees argue, therefore, that the history of this trust administration proves that there is no purpose or intent to favor the remaindermen at the expense of the income beneficiaries, and that the decisions made by the trustee directors with respect to retention of earnings have been based upon business considerations and sound principles of corporate management.
The evidence shows that the corporation is, and has been faced with the necessity of meeting new and nonrecurring-expenditures. Among the 60 tenants of the building was a large religious corporation which, with its affiliated and subordinate organizations, occupied entire floors from the 13th to the 22d, a number of rooms on other floors and a storage area. The total rental paid by it was approximately one third of the entire rent roll. The religious corporation decided to construct its own building. The directors of the corporation knew in the year 1958 that the religious organization and its affiliates would soon vacate the premises. The removal of all of the related corporations required a period of time.
Another problem facing the directors was the mortgage on the Madison Avenue property, which became due in 1960. The directors prepared in advance to meet that problem. They were anxious to renew the mortgage at as low an interest rate as possible, and they recognized that the refinancing would take some time. The managing agents of the building had advised the officers and directors of the corporation that after the removal of the various religious organizations, there would have to be substantial renovation of the building in order to attract a large number of new tenants. Originally it was estimated that $135,000 would be required to renovate the space vacated by the various religious corporations. Later the estimate was revised to $150,000. The managing agents also reported that the air-conditioning lines were not sufficient under modern building conditions, and estimated that approximately $120,000 would *884 be required for air-condition wiring. There was a further estimate of a large sum for improvement of the elevator system so that it could be operated automatically. It was, therefore, apparent to the directors of the corporation that funds should be kept available to meet the cost of refinancing the mortgage, and that other large sums of money would be required for renovation, modernization and improvement of the building.
The mortgage problem was met by a temporary loan from another estate corporation so that Madison Tower could await a more favorable mortgage market and a lower interest rate than could then be obtained. The balance due on the mortgage was approximately $440,000. Madison Tower paid part of that sum and borrowed the remainder from the other estate corporation. At a later time it was able to place a new mortgage of $550,000 at an interest rate satisfactory to the directors. The loan from the other corporation was repaid. There was a balance available for capital improvements. The building is valued at approximately one million dollars.
The air-conditioning lines have been installed and have been substantially paid for. The corporation has actually expended $135,000 for renovations and still owes a balance on that item. Structural defects in the buildings have been corrected at an expenditure of nearly $90,000. Moreover, the operating expenses of the building, as might be expected, have been increasing. In the year 1962, the corporation suffered an operating loss, which was probably due in large measure to the loss of tenants and the period required for renovation. There is no evidence in the record as to whether any further operating losses are reasonably to be expected.
It is patent, therefore, that in establishing corporate reserves, the directors of the estate corporation were acting prudently in a business sense, and that their actions were intended to benefit the corporation and all persons who were financially interested in the corporation. The immediate distribution of all reserves would, it is true, give the income beneficiary a large sum of money, but such an act would seriously prejudice the corporation, and would ultimately harm all those interested in future income and principal. Apart from the purely business aspect of the corporate action, the question still remains whether, under the terms of this will and under principles of law applicable to trust administration, this income beneficiary is nevertheless entitled to immediate distribution of all income earned each year by the corporation.
The objoctant relies upon Matter of Adler (164 Misc. 544) and Matter of McLaughlin (164 Misc. 539). In the case first cited *885 the estate corporation had used earnings to discharge a debt which the corporation owed to the testator. The corporation also continued the testator’s practice of setting up reserves for depreciation. The Surrogate sustained objections to the corporate transactions upon two grounds: first, that the public policy of the State forbids the accumulation of earnings by using them to discharge a capital obligation; and secondly, that the rights of the income beneficiary under the trust instrument entitled him to the income earned by the property. The action of the executor directors in paying the debt from income was held to be a “plain abuse of power”, and the reserves for depreciation were ruled to be improper. The estate corporation was characterized as merely ‘ ‘ a repository for assets which for the enforcement of the policy of the State and the protection of private rights must be dealt with as if owned in deceased’s name ” (pp. 554 — 555). The other cited case also involved the use of earned income to pay a corporation debt and, on the authority of Matter of Adler, a similar ruling was made. While the result reached in these decisions is generally regarded as the proper result, there is not universal approval of the grounds upon which the decisions are based. (See 51 Harv. L. Rev. 937; 47 Tale L. J. 1026; 38 Col. L. Rev. 942; Cahn, Estate Corporations, 86 U. of Pa. L. Rev. 136, 139, n.)
In the pending case, the record does not show that there has been a permanent transfer from income to capital. The reserves, which began during the decedent’s lifetime, had been invested for a long time. It does not appear whether the investment of the reserves had started during the decedent’s lifetime or had been commenced by the trustees, but in any event, the investment of reserve funds was a prudent act. The corporation, acting under what might be regarded as a form of legal compulsion, changed the form of investment. The course of conduct of these trustees gives promise that the income beneficiaries’ rights to accumulated income will be recognized and safeguarded. However, the realty would appear to be presently carried in the reports as capital assets. The use of income to purchase additional realty in order to increase the capital of the corporation would not be proper under the terms of this will, but it is not clear on this record that the moneys invested in the real property were moneys earned during the trust term and, therefore, belong to the income of the trust. At the decedent’s death the earned surplus of the corporation and the depreciation reserves exceeded the cost of the two properties purchased by the corporation. Moreover, at the time of his death, the corporation owned a building at 26 East 56th Street, with a value *886 greater than the cost of the two new properties. That building is no longer included among the assets of the corporation, and there is no evidence as to its disposition or the allocation of any proceeds of sale. Therefore, on this record there is no justification for finding that the action of the trustees directors in purchasing the properties was wrongful insofar as this objectant is concerned.
There is no question of the authority of the trustees to continue the investment in Madison Tower Corporation. The will of this testator gives the trustees broad powers in respect of the management of realty and the retention of investments, and, in addition, it provides: “ I specifically authorize my Executors and my Trustees to retain and continue any investments that I may have at the time of my death in * * * Madison Tower Corp.”. The trustees are also granted wide powers with respect to voting estate shares u and generally to exercise in respect of all 'stocks, bonds or other securities at any time held by my Executors or my Trustees hereunder all rights, powers and privileges that are or may be lawfully exercised by any person owning similar property in his own right ’ ’.
The extent to which a court may interfere with the conduct of corporate affairs by the directors of an estate owned corporation, is a question that does not lend itself to a simple answer. This court has said in a somewhat related context that the problem is one that usually falls “ somewhere between the field of the law of corporations and that of the law of estate and trust administration. Its solution will generally be dictated by considerations of policy and the relative rights and interests of estate beneficiaries, creditors of the corporation and other stockholders, as well as the power, authority and opportunities of the executor director.” (Matter of Nickelsburg, 34 Misc 2d 82, 93.) The failure of fiduciary directors of an estate owned corporation to provide such reserves as prudent business policy dictates, could conceivably result in the imposition of liability upon the fiduciary in favor of the remaindermen of the trust. (Id., p. 94.) On the other hand, the maintenance of improper reserves or the permanent conversion of corporate income to capital may make them answerable to the income beneficiaries. (Matter of Adler, supra; Matter of McLaughlin, supra.) It is sometimes said that where an estate or trust owns all or substantially all of the shares of a corporation, the corporate form may be disregarded and the situation viewed just as if the fiduciaries held title to the corporate assets. This would appear to be an oversimplification of the matter. It is not so much a matter of disregarding the corporate form, but rather of giving para *887 mount consideration to the testamentary plan and scheme, and effectuating it in the manner prescribed by the testator. (Cahn, Estate Corporations, 86 U. of Pa. L. Rev. 136.) Sometimes, due consideration of the testamentary plan demands that the corporate form be respected. This is particularly true where the testator directed the formation of a corporation or the continuance of one formed during his lifetime. (See Matter of Doelger, 254 App. Div. 178, affd. 279 N. Y. 646.)
Under existing rules of trust administration trustees who hold title to parcels of real property may not allocate portions of the income to a reserve for depreciation, at least in the absence of specific authority granted by the trust instrument. (Matter of Davies, 197 Misc. 827, affd. 277 App. Div. 1021; Matter of Ottmann, 197 Misc. 645; Matter of Ball, 197 Misc. 1047.) However, trustees who own shares of stock of a corporation and whose stock ownership enables them to control the corporation, are not under the same disability. In their status as trustees directors, they may, in a proper case, set up reserves for depreciation. (Matter of City Bank Farmers Trust Co. [Clarke], 306 N. Y. 733; Matter of Hubbell, 276 App. Div. 134, revd. on other grounds 302 N. Y. 246, see p. 260; Boyle v. Boyle & Co., 136 App. Div. 367.) In a case where the creator of the trust, as the dominant figure in the corporation, had initiated the practice of setting aside a reserve for depreciation, the court supervising the trust administration is generally reluctant to characterize a continuation of his policy as a frustration of his testamentary plan.
In the pending case there is little evidence respecting the depreciation reserve. There is no proof respecting the decedent’s formula or the method used since that time. The objectant established that there was a corporate reserve for depreciation and the various financial statements reveal the total reserve. There is no proof in this record that would enable this court to say that the present reserve was improper, and the objections, insofar as they relate to the depreciation reserve, are overruled.
There remains for consideration the objections insofar as they relate to the acts of the trustees directors in continuing to retain earnings and in failing to distribute the earnings to the trust estate as dividends. With respect to the retention of earnings by estate corporations, Professor Cahn, in his oft-cited and thoughtful analysis of the subject, had this to say: “ The function of an estate corporation is not to build up equity but to preserve a productive asset intact. Consequently, although trustee-directors have the power to establish suitable reserves out of income, they should exercise that power with consider *888 able caution. This much is clear — that the income of the corporation is not income of the trust. It may become income of the trust upon the declaration of dividends. Even when that takes place, the dividends paid may be required to be apportioned between principal and income. The most that can be said on the part of those who contend for the disregard of the corporate entity is that the trustee-directors may be instructed to declare dividends where failure to do so would render the testamentary scheme nugatory. In essence this is simply a particular and somewhat intensified application of the general rule that directors may not arbitrarily refuse to declare dividends.” (Cahn, Estate Corporations, supra, p. 144.)
Although the declaration of dividends is generally a business matter resting in the sound discretion of the directors of a corporation, a stockholder is not without protection from the courts. 1 ‘ A court of equity will protect a minority stockholder against conduct of the directors which is in breach of the trust confided in them and injurious to the stockholders, but on questions of expediency the courts cannot assume to pass. * * * The courts can, and in a proper case will, compel the trustees to observe the obligations of fiduciary relationship which the law imposes on them. Bad faith, fraud or other breach of trust are grounds for equitable relief. * * * In particular, if the directors refuse needlessly and improperly to divide what are actually surplus profits, the stockholders have an adequate remedy.” (City Bank Farmers Trust Co. v. Hewitt Realty Co., 257 N. Y. 62, 67.) Where rights of other stockholders or of creditors of the corporation are involved, a court may be more hesitant to intervene. But where control of the corporation is vested in a trustee and no other interests are involved except those of the respective trust beneficiaries, a court will more readily act to prevent the trustee from exercising his power in a way that is inconsistent with or contrary to the terms of the trust instrument. (2 Scott, Trusts [2d ed.], p. 1463.) Even in such a case, however, the court should overrule the decision of the directors only where it clearly appears that their action was not justified in the exercise of a reasonable discretion or was contrary to the terms of the trust.
The objectant in the pending proceeding contends that one of the trustees, who is also an income beneficiary, is in such a position, from the standpoint of taxes, that it is more profitable for him to build corporate reserves than to take present dividends, and he implies that the corporate action has been taken to favor such a beneficiary even though it prejudices others. There is no basis, however, for such charges. The evidence *889 indicates ample basis for the action of the directors. The trustees directors had anticipated great expenses and operating deficits. The course of events confirmed their judgment. It cannot now be said that the reserves which they built were too great or that the period of deficit is past. It would be impossible on this record to make a finding that the corporation presently holds an unreasonably greater amount of cash than will be needed in the near future to meet its anticipated obligations. The solution of the present problems and the procurement of new tenants may make clear a future need for smaller reserves than were required in recent years. The court can make no decision respecting the future action of the directors or the judicial action that might be needed to protect the rights of beneficiaries of the trust. The trustees directors must recognize their obligations under the terms of the will. If they should unreasonably refuse to pay surplus earnings to the trust estates, the court will intervene to protect the rights of the income beneficiaries. On the present record it cannot be said that their refusal to declare dividends is unreasonable or improper, or that their action was an abuse of discretion.
The objections are, therefore, in all respects overruled.
The trustees ask the court for instructions as to the manner in which the proceeds of liquidation of Overseas Tobacco Corporation should be allocated between the income beneficiaries and the remaindermen of the four trusts. In their memorandum they contend that all of the net earnings of the corporation during the term of the trust, before depreciation but after deducting any dividends actually distributed, should be allocated to the income beneficiaries. The balance should be allocated to the principal of the trusts. The special guardian concurs in this disposition. No one opposes it. The will gives the trustees discretion to allocate “ a liquidating dividend or other return of capital ”, to income or to principal, in whole or in part. The allocation proposed by the trustees is reported by the special guardian to be “ fair and equitable.” The court will approve such allocation.