(571 P.2d 358)
No. 48,715

JOHN P. JENNINGS, LUCILE JENNINGS GILLE, and LAURA JENNINGS HOUSEWORTH, *Appellants and Cross-Appellees,* v. VIRGINIA SPEAKER, Executrix, *Appellee and Cross-Appellant.*

Opinion filed September 9, 1977.

*John F. Steineger*, of Steineger, Holbrook, Parks & Fritz, of Kansas City, Kansas, and *William K. Waugh, III*, of Lathrop, Koontz, Righter, Clagett, Parker & Norquist, of Kansas City, Missouri, for the appellants and cross-appellees.

*J. Donald Lysaught*, of Weeks, Thomas, Lysaught, Bingham & Mustain, Chartered, of Overland Park, for the appellee and cross-appellant.

Before HARMAN, C.J., FOTH and SPENCER, JJ.

FOTH, J.: This is a dispute between the income beneficiary and the remaindermen under an express *inter vivos* trust over the right to earnings of a holding company owned by the trust. The trial court held, in essence, that the income beneficiary was entitled to all the corporate earnings whether paid out as dividends or not. The remaindermen have appealed from that and certain collateral rulings; the life tenant (represented by her executrix) cross-appeals from the denial of attorney fees.

This case is a sequel to *Jennings v. Jennings*, 211 Kan. 515, 507

P.2d 241, decided March 3, 1973. There the court found that a 1943 agreement between A. H. Jennings, Jr., his brother Frank H. Jennings, and Frank's wife Lucile, constitutes an express *inter vivos* trust. The corpus of the trust consists of all the shares (1000) of the National Investment Company, a family real estate holding company which was formed in 1923, while the father of the two brothers was still alive. A genealogical chart of the Jennings family and the pertinent terms of the agreement are to be found in the *Jennings* opinion.

The income beneficiaries were the two brothers while they were alive. Upon their respective deaths each was succeeded as income beneficiary by his widow. Thus when Frank died in 1953, his widow Lucile became entitled to his one-half of the income. Then, in 1969 when A. H. Jennings, Jr., died, his widow Mae became entitled to *his* one half. (It is with Mae's right to income that we are here concerned.) When Mae died on March 9, 1975, Lucile became the sole income beneficiary during the balance of her life. When she dies the remainder will pass to the three children of Frank and Lucile, namely, John P. Jennings, Lucile Jennings Gille, and Laura Jennings Houseworth.

During their lifetimes the two brothers were the trustees. Upon Frank's death, title to his shares devolved upon his children, but under the agreement A. H., Jr., remained in sole control of the family corporation. Upon his death, title to his shares also devolved upon Frank's children. They thereupon became trustees for their mother Lucile and their aunt (by marriage) Mae, as well as remaindermen. It is in their role as trustees that the three children oppose Mae's claim to income, and they will be referred to as the trustees.

In the first *Jennings* case it was the trustees who were successful in having the 1943 agreement determined to be a trust, and in establishing their title as trustees to certain shares of the corporation which A. H., Jr., had transferred in his lifetime to his wife Mae, who was the defendant in the action. The trustees were joined in that suit by their mother Lucile, the other life tenant, but she has taken no active part in this proceeding.

After the mandate was filed in that case in 1973, on Mae's motion the trial court entered an order (1) requiring the trustees to furnish to Mae annual audited reports of the corporation and semiannual custodian reports of the bank holding securities for

the trust, and (2) requiring annual payments of income. It concluded its order by saying, "The Court further finds that further interpretation of this trust and the provisions under the same do not fall within the jurisdiction of this Court in this particular case."

After Mae died her executrix, Virginia Speaker, moved to be substituted for her as defendant in the original action. The trial court concluded that its finding of "no jurisdiction" quoted above was beyond its power, ordered the finding stricken, and ordered that the substitution be made. The executrix then moved for an accounting by the trustees and a judicial determination of the amount due the estate of the deceased life tenant.

The trial court made four substantive rulings in connection with the accounting. First, it held that the corporate nature of the holding company should be disregarded and its net income allocated between life tenant and remaindermen as if the trustees had held the corporate assets directly. In making the allocation the court applied the Uniform Principal and Income Act, K.S.A. 58-901, *et seq.* Second, it disallowed a number of expense items which were taken against income on the corporation's books. Third, it limited the accounting to the two-plus years from January 1, 1973, to Mae's death in March, 1975. The trustees have appealed from those three rulings.

The fourth substantive ruling was to disallow the claim of Mae's executrix that the trustees be surcharged for her attorney fees. She has cross-appealed from that ruling.

Before taking up the contentions of the parties on those four issues we must first dispose of the trustees' procedural claim. They contend that the trial court's 1973 declaration that "further interpretation of this trust" was beyond its jurisdiction was res judicata, precluding any further action in the case. There are several reasons why that position is untenable. First, the declaration was a purely gratuitous obiter dictum. There was no issue of future interpretation before the court at that time, so that an appeal would have been fruitless; even a declaratory judgment action requires an actual controversy. Secondly, the present motion is not really an action for "further interpretation" of the trust, but one to enforce those portions of the order requiring accountings and the periodic payment of income.

Thirdly, and most important, if the statement were to be given

the res judicata effect claimed, there would be no forum available to resolve the present dispute. As the trustees concede, only the district court has jurisdiction to monitor their activities as *inter vivos* trustees; if they were correct in their contention that the "no jurisdiction" declaration is binding, they could do as they please, free from any judicial control. While courts may in certain limited circumstances decline to exercise jurisdiction over a particular case as a matter of judicial discretion, courts may not simply close their doors to litigants who are entitled to a resolution of their claims. An abdication of subject matter jurisdiction is a far different thing from a determination that the court does or does not have jurisdiction over a particular defendant, and for that reason most of the cases cited by the trustees are not in point. Jurisdiction in this case is conferred by our Constitution (Art. 3, § 1 and 6[*b*]) and by statute (former K.S.A. 20-301). We fully agree with the trial court that its "no jurisdiction" finding was beyond its power, and conclude that it was properly set aside.

The trustees also seem to argue that the order was not really res judicata but merely terminated action "in this particular case," so that a new lawsuit should have been initiated. We regard such an argument as at best a technicality. We are admonished by K.S.A. 60-2105 to disregard technical irregularities which do not affect the "substantial rights" of the parties. The only possible right affected by hearing this matter in the original case instead of a new one might be the clerk's right to receive another docket fee. This is hardly a concern of the litigants.

We turn, then, to the primary issue in this case, which is whether the life tenant was entitled to all the income of the corporation, computed according to the Uniform Principal and Income Act, or whether she was entitled to only so much income as the directors (trustees-remaindermen) might choose to declare as dividends. The trial court resolved the issue in favor of the former alternative, and we concur.

Several factors lead us to that conclusion. The trustees, of course, have a conflict of interest between their roles as trustees and remaindermen, derived from the structure of the trust instrument. But they are also, at their own election, the directors of the wholly owned holding company, and thus in full control of its dividend policy. Obviously any earnings retained by the company and not paid out as dividends will enrich them personally as

remaindermen. This is a conflict created by their own action.

The second major consideration in our thinking is the character of the corporation as a holding company. Its last balance sheet before Mae died (*i.e.,* as of 12-31-74) showed it owning four pieces of rental real estate with a total book value of $48,875, after depreciation reserves of $178,690. (Market value of the real estate is not shown.) In addition it owned securities worth almost $300,000, including a short term treasury bill worth over $120,000. Owning real estate and securities is its only business. It has no employees: its real estate rentals are handled by an independent real estate management firm, and its portfolio is handled by a bank through a custodian account.

The result is that the cases cited by the trustees which involve going businesses are not really in point. Generally speaking, those cases stand for the proposition that a court will not substitute its judgment for that of corporate directors in matters of dividend policies, at least in the absence of fraud or bad faith. That is because its directors are in a far better position than a judge to evaluate such a corporation's needs and problems concerning cash needs for payroll, inventory, long and short term financing, improvements and expansion, contingencies, and the like. Common business prudence nearly always requires that some portion of current earnings be retained in the coffers of an operating business, rather than be distributed as dividends. Such considerations, applicable to the ordinary mercantile, service or manufacturing corporation, simply are not relevant to a holding company such as we have here. While short term retention may sometimes be justified, in the long run retained earnings can serve no corporate purpose for a holding company except to convert income into capital. Where a trust is involved this necessarily benefits the remaindermen at the expense of the life tenant. No justification was offered for retaining earnings in this corporation beyond the custom of corporations in general, which in the case of a holding company is no justification at all.

More nearly in point than the trustees' cases are two holding company cases cited by Mae's executrix, *Matter of Adler,* 164 Misc. 544, 299 N.Y.S. 542 (1937), and *Matter of McLaughlin,* 164 Misc. 539, 299 N.Y.S. 559 (1937). In *Adler* testamentary trustees owned 100 per cent of the stock of a real estate company, and served as its directors. The company used earnings to pay a debt

due decedent at the time of his death. The court held that the trustees were accountable as trustees for their conduct as directors; that the payment of the debt was an impermissible conversion of income into principal at the expense of the life tenant; and that the court's control over them as trustees permitted it to direct their conduct as directors. (The court there went further, and found that the establishment of depreciation reserves for new elevators and to recapture the cost of buildings and fixtures was also an impermissible diversion. No such claim is made here; the Uniform Principal and Income Act authorizes depreciation reserves and Mae's executrix makes no objection to the reserves utilized by these trustees.)

*McLaughlin* went even beyond *Adler*. That case also found an impermissible conversion of corporate income into principal. But in addition to ignoring the corporate entity for present accounting purposes, the court found that the holding company served no purpose useful to a trust and made allocation between income and principal difficult; therefore it ordered the trustees to dissolve the corporation and take title to its assets directly. (Again, no such drastic relief is sought here, but only that the corporate income be treated *as if* the trustees owned the corporate assets directly.)

*Adler* and *McLaughlin* were both cited approvingly in *Matter of Shehan*, 285 App. Div. 785, 141 N.Y.S.2d 439 (1955). The court there reaffirmed the principle that trustees who also serve as corporate directors are accountable in the same proceeding for their conduct in both capacities. Whether the corporate entity should be ignored and the corporation considered an adjunct of the estate depends on the circumstances, the court said, but accountability was indisputable. The court reemphasized that in his capacity as director a trustee is bound by the same fiduciary standards that govern his conduct as trustee, including the duty of undivided loyalty to the beneficiary untrammeled by the trustee's private interests.

The trustees seek to overcome those authorities by citing *Matter of Schnur,* 39 Misc. 2d 880, 242 N.Y.S.2d 126 (1963), where Surrogate Di Falco distinguished *Adler* and *McLaughlin.* The case does little for their position. In *Schnur* the court noted that continued recognition of the separate entity of an estate-owned corporation was sometimes appropriate to effectuate the testamentary plan and scheme, and found the circumstances there fell

into that category. The continuation of depreciation reserves established by the testator was therefore approved. The temporary establishment and investment of other reserves was also approved, but only because of demonstrated business contingencies. The approval of these reserves, however, was expressly predicated on findings that "the record does not show that there has been a *permanent* transfer from income to capital," and that "[t]he course of conduct of these trustees gives promise that the income beneficiaries' rights to accumulated income will be recognized and safeguarded." (39 Misc. 2d at 885. Emphasis added.) The expectation was that in due course the income beneficiaries would receive all accumulated income; there is no suggestion that such income could be permanently withheld and later paid over to the remaindermen. Here, no specific need for temporarily retaining earnings has been demonstrated, and permanent retention would convert income to principal. With Mae's death the time to pay over accumulated earnings to the life tenant has arrived.

It is argued that the corporate entity should not be ignored here because of the way the two brothers treated it during their respective lifetimes; never was *all* the income paid out as dividends while they managed things. We are unimpressed by this argument. During the time the settlors were trustees they were also the income beneficiaries. Their failure to draw all the income available could have been due to many factors—tax considerations, a desire to build an empire, or even a desire to benefit the remaindermen. Whatever the reason, the retention of corporate earnings while they were alive hurt only them, not those having a conflicting interest in the trust. During the time A. H. Jennings, Jr., served as sole trustee, he was authorized by the agreement itself to control the corporation "without interference" from either Lucile or her children, the present trustees. He was, under the trust instrument, accountable only to himself. When the children became trustees, however, they were not protected by the instrument from accountability to the other beneficiaries of the trust, including Mae. Further, with the shift in control to the new generation it became for the first time in the trustees' self-interest to retain corporate earnings. They could only do so at the expense of one entitled to the trust's income by the trust instrument and by law.

We therefore hold that under the circumstances of this case the court had the equitable power to ignore the corporate entity and to require the trustees to account for the corporate earnings as if they had held the corporate assets directly, and did not abuse its discretion in doing so.

The second substantive issue raised by the trustees concerns the adjustments made to the corporate income figures for each of the years 1973, 1974, and the partial year 1975. These adjustments were of two types: (1) restoring to income an $8550 item written off in 1973 on account of the decline in value of two investments; and (2) reallocation to the principal account of accounting and legal expenses and a trustee fee which had been allocated to income. (All adjustments made were net of income taxes.)

From what has previously been said it is clear that the first adjustment was proper. Had the securities been sold and the loss actually realized, it would have been a capital loss. In the same year the corporation did realize a capital gain of almost $7500, which was excluded by the trustees in computing the corporation's "ordinary income." Applying consistent trust accounting principles to both transactions, both were capital transactions properly allocable to the trust's principal account. See K.S.A. 58-903.

The expense items were allocated to principal by the court because the trustees failed to meet their burden of proof that they should be allocated to income. The accountant who testified for Mae's executrix could find no reason in the data available to him for allocating the items to income, so he allocated them to principal. The trustees' accountant had no present recollection of why they were deducted from income, but was confident they were proper from a corporate accounting standpoint—with the information on hand at the time he deducted them. He went on to say:

"THE WITNESS: But, I have to qualify my reply by saying that, if we had knowledge at that particular point in time, we would have made the allocation. If we did not have that knowledge, the full amount would have been charged here as shown."

The trial court's answer to the trustees was:

"4. The plaintiffs-trustees have urged the application of the presumption stated in *Henshie v. McPherson & Citizens State Bank,* 177 Kan. 458, 473, 280 P.2d 937, that trustees are presumed to have acted in good faith. The Court has given effect to that presumption, but has also applied the burden of proof rules set out in the quotation from Bogert on Trusts and Trustees on the same page of that opinion and in accordance therewith made its Finding of Fact No. 10. . . ."

"10. The accounting trustees failed to prove to the satisfaction of the Court the merit of the claims for credit in the accountings which were objected to by the substituted defendant in the testimony of said defendant's expert witness."

The burden of proof rules in *Henshie,* referred to by the trial court, are as follows:

"The general rule is stated in *Bogert on Trusts and Trustees,* Vol. 4, Part 2, § 971, as follows:

" 'The burden is on the accounting trustee to prove to the satisfaction of the court the merit of all claims for credit which he makes. If he makes out a prima facie case for credit, an objecting beneficiary will have the burden of introducing evidence and overcoming this case. It will then be a question of fact for the court as to whether the trustee has sustained his claim by the preponderance of the evidence.'

"Trustees are presumed to have acted in good faith. (See *Prager v. Hart,* 106 Kan. 14, 186 Pac. 1015; also *Clark v. Clark,* 123 Kan. 646, 256 Pac. 1012, and *Elward v. Elward,* 117 Kan. 458, 232 Pac. 240.)" (177 Kan. at 473.)

The trial court thus found that the trustees had not met their burden of proof. Our scope of review is limited.

"The effect of a negative finding by a trial court is that the party upon whom the burden of proof is cast did not sustain the requisite burden. Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice the finding of the trial judge cannot be disturbed. An appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial judge may have believed." (*Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, 548 P.2d 719, Syl. 5.)

There was little offered by the trustees to justify the allocation of the challenged expenses to income beyond the testimony cited above. We certainly cannot say the trial court arbitrarily disregarded any undisputed evidence, or that its findings were the result of any "extrinsic consideration." Its findings in this respect therefore cannot be disturbed.

The trustees also complain about the trial court's limiting the accounting to the period commencing January 1, 1973. By so doing the court excluded from consideration a $50,000 dividend, even though paid in June, 1973, because it was paid from corporate surplus accumulated prior to December 31, 1972. (An additional $7,000 paid in 1973 from 1973 earnings was considered.) We think the point is well taken.

The essence of the Supreme Court's decision in the first *Jennings* case was that title to all corporate stock vested in the present

trustees on the death of A. H. Jennings, Jr., in 1969, and that Mae Jennings became an income beneficiary of the trust at that time. The theory of her executrix in this proceeding, adopted by the trial court and now approved by this court, was that Mae as life tenant was entitled to one-half the net earnings of the corporation computed as if the trustees owned the corporate assets directly. Hence, in order to determine how much Mae was underpaid during her lifetime it is necessary to ascertain one-half the corporate income during the entire period Mae was entitled to receive it, and deduct all amounts actually paid to her during that same period.

It is agreed that the $50,000 dividend was paid out of pre-1973 earnings. However, it is also apparent that by the end of 1973 distributions for the period of Mae's entitlement did not equal corporate income for that period, after the 1973 adjustments made by the trial court and approved above. It is necessary to recompute the balance due Mae as of January 1, 1974, and this court has done so from the uncontroverted evidence presented for the years prior to 1973, and giving effect to the trial court's 1973 adjustments:

| Income (total) | | |
|---|---|---|
| 1969 (June 12 to Dec. 31) | $ 7,796.45 | |
| 1970 | 24,524.90 | |
| 1971 | 22,497.84 | |
| 1972 | 17,960.00 | |
| 1973 | 18,878.00 | |
| | | $91,657.19 |
| Dividends: | | |
| 1972 | 30,000.00 | |
| 1973 (less $100 retained by trustees) | 57,000.00 | |
| | | 87,000.00 |
| Total retained as of December 31, 1973 | | $4,657.19 |

Mae was entitled to one-half of that amount, or $2,328.60. Employing the trial court's formula, of which no complaint is made, she was also entitled to 6% simple interest from January 1, 1974, to October 29, 1976, or $395.03. Our recomputation does not affect the trial court's figures for 1974 ($6,117.00 plus $670.69 interest), and the partial year of 1975 ($3,215.50 plus $316.62 interest), and they are approved.

Finally, we reach the claim on cross-appeal that the trustees should pay the attorney fees incurred by Mae's executrix in this proceeding, either by way of surcharge or as exemplary damages.

On this record we cannot agree. Surcharge in the ordinary sense is not appropriate unless there has been loss to the trust estate. See *Jennings v. Murdock,* 220 Kan. 182, 553 P.2d 846, Syl. 14. No loss is claimed here. Assuming exemplary damages would be allowable upon a finding of bad faith, we are faced with the trial court's finding:

"The Court, having heard the arguments of counsel and being duly advised in the premises, states that he did not find that the plaintiffs-trustees acted in good faith, but found that their actions were not an intentional, willful, purposeful act to withhold monies from defendant, Mae N. Jennings, for the benefit of the plaintiffs-trustees, and on that basis the Court had denied the substituted defendant's application for exemplary damages and attorneys' fees."

The clear import of this finding is that neither side carried the day on the good faith-bad faith issue. As in our previous discussion of the disallowance of credits, we are once again unable to say that the uncontroverted evidence compelled any particular finding. See *Highland Lumber Co., Inc. v. Knudson,* supra.

On the appeal the principal amount of the judgment is modified to $13,043.44, and as so modified is affirmed. On the cross-appeal the judgment is affirmed.