In the Matter of the Estate of LAURENCE DAVIES, Deceased.

Surrogate's Court, New York County, February 3, 1950.

*Ehrich, Royall, Wheeler & Holland* for Manfred W. Ehrich, as trustee under the will of Laurence Davies, deceased, petitioner.

*J. Quincy Hunsicker, III,* and *Hewitt A. Conway* for Central Hanover Bank & Trust Company, as contingent trustee under the will of Laurence Davies, deceased, respondent.

*Francis X. Mancuso,* special guardian for Michel L. Davies and another, infants, respondents.

*S. Arthur Glixon* and *Jerome M. Klein,* as committee of Lottie E. Davies, an incompetent, respondent.

*Nathaniel L. Goldstein, Attorney-General (P. Hodges Combier* of counsel), for charities, respondent.

*Mitchell, Capron, Marsh, Angulo & Cooney* for Manhattan Eye, Ear, Nose & Throat Hospital, respondent.

*Proskauer, Rose, Goetz & Mendelsohn* for Federation of Jewish Philanthropies of New York, respondent.

*Benjamin, Galton & Robbins* for Mt. Sinai Hospital, respondent.

COLLINS, S. In *Matter of Ottman* (197 Misc. 645) this court applied what has heretofore been considered the well-established rule that a trustee is not permitted to charge against trust income an amount to offset the depreciation of real property held in trust, unless the will of the testator discloses an intent that such a reserve be maintained. The pending proceeding raises again that identical question. The parties concede that there is nothing in this will that manifests any intent to require such a reserve, and it would ordinarily be sufficient to dispose of the issue merely by reaffirming the principles stated in *Matter of Ottman (supra).* However, the continued litigation of this question and the nature of the arguments advanced therein, make it appear to this court that a more extended discussion of fundamental principles might serve to dispel some of the perplexities which now seem to disturb trustees, beneficiaries and counsel.

The testator died in 1929. In all the years of the trust administration, neither the present trustee nor his predecessors ever maintained any reserve for depreciation of any of the parcels of real property held in trust. The account of the prior trustees was judicially settled. The present trustee has settled his account for the period ending June 15, 1948. No objection was ever made in either accounting to the failure to maintain a reserve for depreciation. The trustee now holds four parcels of

real estate which had been acquired by the testator. He petitions the court to construe the will and to instruct him " whether it is required that the trustee set up a reserve to offset depreciation of the buildings on the trust properties and, if so, the amount thereof." The trustee, the income beneficiary and a trustee of a contingent secondary trust in perpetuity, contend that a trustee under this will is not required or permitted to deduct from the income of the realty amounts to offset depreciation. They are opposed in this view by the special guardian of infant remaindermen who argues that the trustee is required to set up a reserve to offset depreciation. He concedes that the will is silent in respect of maintenance of depreciation reserves. He maintains, however, that the correct rule is " that unless the trust instrument otherwise *expressly* provides the trustees are not only permitted, but required to set aside from gross rents received, a fund which may be used to preserve the corpus of the estate intact for the benefit of the remaindermen, whether the trust asset be what is commonly known as a wasting asset, or real estate, which differs therefrom in degree only, and not in kind. It is immaterial whether that fund be called a depreciation fund or otherwise " (*Matter of Kaplan,* 195 Misc. 132, 141, emphasis added). In the case relied upon by the special guardian, the court made clear its adherence to the rule that only an explicit contrary direction in the will can relieve the trustee from the duty of maintaining a depreciation reserve, for the court again said: " While in reaching this conclusion the court has referred to the language of decedent's will and the fact that he was engaged in his lifetime in the erection and operation for investment purposes of multiple-family dwellings, the obligation and right to charge depreciation against gross rents is not dependent either upon the wording of the will or trust instrument, or the nature of the business in which decedent was engaged. In the absence of a definite direction to the contrary it is the fiduciary's duty to establish such a depreciation reserve " (p. 145). The rule so stated is the direct converse of the rule applied by this court in *Matter of Ottman (supra).*

The decision in *Matter of Kaplan (supra)* was followed by the same court in *Matter of Dahlmann* (95 N. Y. S. 2d 74). In these decisions the court directed that the reserve for depreciation and obsolescence be created by a charge against gross rents in the same amount and at the same rate at which the realty may be depreciated for income tax purposes. The special guardian adopts the reasoning of those decisions and argues for the crea-

tion of a reserve similar in character and computed upon the same basis.

The reserve, which the special guardian contends must be created, appears to be a fund which will not only offset the physical depreciation of the properties, but will also defray the cost of unusual or extraordinary future repairs. The following excerpts from the decision in *Matter of Kaplan* (*supra*, pp. 135, 141, 142, 145) indicate the type of fund which the special guardian seeks to compel the trustee to create. The court said (emphasis supplied): " Apartment buildings, like all things created by human hands, must inevitably decline in value through mere lapse of time, exposure to the elements, and ordinary wear and tear. Thus the payment of the bare excess of receipts over outgo, without some provision to restore capital to its initial utilitarian value, constitutes an encroachment upon corpus. Since the court is required to consider and protect the respective rights of the income beneficiaries and remaindermen, it cannot permit the entire excess of rent receipts over carrying charges to be paid out as income, without reserving what it deems to be a fair and reasonable amount for the preservation of capital. Such reserve will make for stability of income, since the beneficiary thereof will not suffer by *large repairs* being charged in any one year and the remaindermen will benefit because at all times there will be available a fund out of which the property may be *maintained* in proper manner. Both will thus benefit by constant *maintenance* of the premises in the best rentable condition. * * * This court does not agree with *Matter of Adler, Matter of Edgar, Matter of Crimmins* and *Matter of Danziger* (*supra*), insofar as they denied the right of the trustees to withhold income and create a reserve account in order to meet the cost of anticipated *future repairs.* * * * The gross rents received from real estate are paid for the use and occupancy of the premises and until all of the current expenses for taxes, interest, insurance and ordinary repairs are paid and a reasonable provision made for *preservation* of the building, for anticipated *future repairs* or *depreciation,* there is no net income available for the income beneficiary. * * * If no provision is made for future *repairs* or *depreciation* then the income beneficiary is benefited at the expense of the remaindermen. The trustee is under obligation to *maintain* the property during the life of the trust in *rentable condition.* There are many items of such *maintenance* that do not recur annually but over five- or ten-year periods. If the cost of such items are charged when incurred then the income of the beneficiary will be subject to

violent fluctuation. A fixed rate of reserve provides a fund out of which *large repairs* can be borne and still provide a stable return to the beneficiary. * * * The reserve fund is to be created by a charge to gross rents received conforming to testator's practice in filing his income tax returns. Such funds are not irrevocably allocated to corpus. The disposition of such reserve fund as between income and principal is expressly reserved for determination until such time as the trust has terminated, or upon an earlier application when the facts shall warrant such determination.''

The fund here urged is not precisely the same as the reserve usually contemplated in depreciation accounting. (See Freeman on Public Utility Depreciation, 32 Corn. L. Q. 4, 12.) The suggested reserve in trust estates is not to be irrevocably allocated to corpus. The fund is to be used to offset depreciation, to pay the cost of future extraordinary repairs and improvements, to meet the expenses of maintenance and preservation other than those which regularly recur over short periods of time. It is true that the uses to which depreciation reserves may be put will often depend on the purpose for which they were created (Cf. Freeman on Public Utility Depreciation, 32 Corn. L. Q. 4; *Buffalo Union Furnace Co.* v. *Helvering,* 72 F. 2d, 399, 401; *People ex rel. Third Ave. R. R. Co.* v. *State Board of Tax Comrs.,* 212 N. Y. 472, 482; *People ex rel. Adirondack Power & Light Corp.* v. *Public Service Comm.,* 200 App. Div. 268, 274, 275), but depreciation generally excludes costs chargeable to maintenance.

The conjunction of the terms '' depreciation,'' '' repairs,'' '' maintenance '' and '' preservation,'' in connection with a so-called depreciation reserve, serves to confuse the real issue. The aim and purpose of the suggested reserve are to take money from the income account and hold it for ultimate disbursement for any one or more of the suggested purposes. Any discussion of the pertinent authorities requires us to deal separately with these very different items in order to ascertain whether the creation and use of such a fund would be either necessary or permissible.

We shall advert first to depreciation. The term is usually defined as the loss or decline in value which occurs gradually over the useful life of a material thing, due to physical wear, tear and decay. The definition of the term '' depreciation '' generally limits it to the losses or declines in value which are not restored by current repairs and maintenance. '' Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement

of the property. These factors embrace wear and tear, decay, inadequacy and obsolescence.'' (*Lindheimer* v. *Illinois Bell Tel. Co.*, 292 U. S. 151, 167.) '' We suppose that judicial notice may be taken of the fact that in the conduct of many industrial enterprises there is a constant deterioration of the plant which is not made good by ordinary repairs which, of course, operates continually to lessen the value of the tangible property which it affects.'' (*People ex rel. Jamaica Water Supply Co.* v. *State Board of Tax Comrs.*, 196 N. Y. 39, 57.) '' In *People ex rel. Manhattan Ry. Co.* v. *Woodbury* (203 N. Y. 231, 236) we held ' that the annual allowance for depreciation should be computed by dividing the values of the various kinds of tangible property by the number of years of their respective estimated physical lives.' Obviously, the ' lives,' as there treated, are the periods of time through which the ' various kinds of tangible property ' will respectively, with ordinary and adequate annual renewal and repairs, continue efficient in and commercially adaptable to their respective processes and functions.'' (*People ex rel. Third Ave. R. R. Co.* v. *State Board of Tax Comrs.*, 212 N. Y. 472, 483, 484, *supra.*) '' Exhaustion is constantly being restored in part as well as retarded by current maintenance, and it is generally recognized that in defining depreciation there must be an exclusion from the costs or losses from exhaustion in respect of costs chargeable to maintenance '' (Accounting Research Bulletin No. 16, American Institute of Accountants).

It would seem wholly unnecessary to refer to the distinction between a loss in value due to depreciation and a loss caused by the failure of a trustee faithfully to perform his duty to make repairs and to maintain the premises in proper condition. Much that is said in argument about depreciation of buildings is really meant to refer to real estate that is not maintained in proper condition. The distinction between the two must be kept clearly in mind. The present proceeding in no way involves any question respecting the trustee's performance of that duty or of liability for failure to perform it.

The New York rule has heretofore been clearly understood as prohibiting a trustee from charging real property income with depreciation, at least in the absence of a contrary direction in the will. The decision in *Smith* v. *Keteltas* (62 App. Div. 174) is most frequently cited as setting forth the authoritative declaration of the rule. In that case, the trustee of a testamentary trust had used a portion of an award in condemnation proceedings to construct new buildings in place of old untenantable structures.

The appellant argued first, that under no circumstances did the trustee have the right to use any part of the principal of the trust estate to erect new buildings, and, secondly, that the trustee should have expended sufficient moneys to keep the property in tenantable condition. In respect of the second argument, the court said that the condition of the old buildings resulted not from the necessity of temporary repairs but from their age. On this branch of the case, the court held that the trustee was not bound " ' to reserve and withhold from the life tenant moneys out of the income for the purpose, not of repair, but of erecting wholly new buildings when those already upon the premises should, by reason of lapse of time, become incapable of further repair.' " This statement by the Appellate Division seems to this court to hold, clearly and explicitly, that a trustee is not required to maintain a reserve for *depreciation* of real property. It has generally been accepted as authority for that rule (2 Scott on Trusts, § 239.4, p. 1343; Report of Law Revision Commission, N. Y. Legis. Doc., 1950, No. 65–0; 3 Bogert on Trusts and Trustees, § 600, p. 127, note 4) and has been followed for nearly half a century (*Matter of Edgar,* 157 Misc. 10, 13; *Matter of Adler,* 164 Misc. 544; *Matter of Horowitz,* 192 Misc. 556; *Matter of Crimmins,* 159 Misc. 499, 502; *Matter of Danziger,* 58 N. Y. S. 2d 790, 795, mod. on other grounds, 271 App. Div. 888; *Matter of Wadsworth,* 81 N. Y. S. 2d 298; see, also, *Matter of Chapman,* 32 Misc. 187, affd. 59 App. Div. 624, affd. 167 N. Y. 619). It is significant that in all that time, no decision, other than the one relied on by the special guardian, has ever held that a trustee must deduct from income annual sums to offset *depreciation of real property. Matter of Hubbell* (276 App. Div. 134) involved a depreciation reserve set up by a corporation in which the trust estate owned a one-half interest. Several other grounds were advanced in support of the decision there reached. The testamentary plan of the decedent, the rights of creditors of the corporation and the corporation's own interests apparently pointed the way to the judgment of the court. That decision is no authority for the principle urged by the special guardian.

The rule applied in this State is in force also in other jurisdictions. In *Evans* v. *Ockershausen* (100 F. 2d 695, 708) Mr. Justice VINSON said: " It is the general law of trusts 'to forbid deductions from distributable income on account of depreciation, and to place upon the remaindermen the burden of any shrinkage in capital value of that nature.' " (See, also, *Freuler* v. *Helvering,* 291 U. S. 35; *Laflin* v. *Commissioner of Internal*

*Revenue,* 69 F. 2d 460; *Matter of Roth,* 139 N. J. Eq. 588, and *Chapin* v. *Collard,* 29 Wn. [2d] 788.)

A rule that has been so long accepted is not to be discarded readily or nullified by tenuous distinctions. Upon the assumption that the court decisions mean what they explicitly say, wills have been made, trusts have been administered, beneficiaries and fiduciaries have been given legal counsel. If during all these years, trustees have nevertheless been bound to maintain reserves to offset depreciation of real property, no hint of that duty has been made in judicial decisions. If that duty exists and has not been performed, countless trustees would now face large surcharges. The question has been directly presented in the cases cited above. In countless other cases, courts have ruled on the allocation and apportionment of charges for repairs and improvements. Even if, in cases where the question has been directly presented the appellate court did not mean what it said and the lower courts consistently misinterpreted the holding, one would naturally expect a word of caution in decisions where definitive rulings were made as to allocation or apportionment of costs of improvements. If a depreciation reserve were necessary, original allocations must be subject to further adjustment. No hint of that procedure was ever given. As Chief Judge CARDOZO has said: '' A word of caution or suggestion would have set the erring suitor right. Many pages of opinion were written by judges the most eminent, yet the word was never spoken. We may not speak it now. A change so revolutionary, if expedient, must be wrought by legislation.'' (*Ultramares Corp.* v. *Touche,* 255 N. Y. 170, 187.)

The court, therefore, holds that the trustee is not required to set up a reserve to offset depreciation of the parcels of real property.

The reserve contemplated by the special guardian would be used, as has been said before, not only to offset true depreciation but to defray expenses for repairs and improvements. The fund would consist wholly of deductions from income. It would be used indiscriminately for expenses for which income was only partly responsible or not responsible at all. Such a reserve fund cannot be justified under accepted principles of trust administration.

Whether the obligation to defray charges falls upon the income account or upon the principal account or upon both, depends on the nature of the repair or improvement. The cost of permanent improvements is, in the absence of special equities, usually chargeable to principal. (Restatement, Trusts § 233, comment

[k]; 2 Scott on Trusts, § 233.3, p. 1264; *Stevens* v. *Melcher,* 152 N. Y. 551, 571, 572; *Smith* v. *Keteltas,* 62 App. Div. 174; *Peltz* v. *Learned,* 70 App. Div. 312, 313; *Matter of Windsor Trust Co.,* 142 App. Div. 772, 774; *Matter of Adler,* 164 Misc. 544, 557; *Matter of Heroy,* 102 Misc. 305, 312; *Matter of Miller,* 175 Misc. 583, 584.) Special circumstances may warrant a court of equity to direct an apportionment of the charge. As the court said in *Stevens* v. *Melcher* (*supra,* p. 571): " A building is commonly known as a ' permanent improvement.' It is quite possible that this is a misnomer and that there is no such thing as a permanent improvement. We are aware that things are subject to decay and deterioration, but the improvement was so far permanent as to be recognized in the law as such, and as we understand the finding, it is that the property was permanently improved in the amount named." The theory underlying the rule respecting permanent improvements is that as a result of the payment from principal, the life beneficiary loses the income on the amount of the principal so paid. " The principal has simply been changed from one form to another and the life beneficiary receives the income in one form instead of another." (2 Scott on Trusts, § 233.3, p. 1265.)

Obviously a reserve created by deductions from income could not be used to pay for improvements which principal is obligated to pay. If there are special circumstances justifying an apportionment of the cost, the apportionment must be made by a court of equity, not by a trustee. Certainly, income cannot be charged presently for an anticipated so-called permanent improvement.

Where the improvements are not permanent in character but have rather a life of limited duration, the cost is paid initially out of principal and is amortized out of income over the probable life of the improvement (*Matter of Adler,* 164 Misc. 544, *supra; Matter of del Drago,* 179 Misc. 383; Restatement, Trusts, § 233, comment [1].) " The result is that if the trust does not terminate before the end of the probable life of the improvements, the whole cost of the improvements will be paid out of income. This is fair because the beneficiary entitled to the income gets the full benefit of the improvements and the remainderman gets no benefit. On the other hand, if the trust terminates prior to the end of the probable life of the improvements, the payments from income will cease on the termination of the trust. This is fair because the beneficiary entitled to the income has not received the full benefit from the improvements but the

remainderman receives a part of the benefit.'' (Restatement, Trusts, § 233; See, also, 2 Scott on Trusts, § 233.3, p. 1266, and *Matter of Adler, supra.*)

The reserve which the special guardian here urges would cause the trustee to deduct from *present* income to pay for a *future* temporary improvement. The result would be that the improvement would be amortized, not over the period of its probable life, but rather over the period during which the trustee anticipated it. Thus, income would pay for a temporary improvement that might not actually be made during the trust term. Under such circumstances, the income beneficiary would be compelled to pay more than her equitable and fair share of the cost. Any attempt by a trustee thus to shift to income more than its fair share of the cost would violate fixed and settled rights of the income beneficiary. Such a '' reserve cannot be justified for prospective use.'' (*Matter of Adler, supra,* p. 556.) A reserve for such use cannot be permitted.

Finally we come to the ordinary current expenses fairly incidental to the maintenance of the realty. It is undisputed that the income account must bear the entire cost of these expenses. (*Matter of Albertson,* 113 N. Y. 434, 439; Restatement, Trusts, § 233, comment [e].) Most of these charges are payable annually. Some expenses, such as insurance premiums, painting, decoration, and the like, may recur over three-year periods. It is true that if all such charges were paid out of a single year's income, the life beneficiary's income would be subject to, perhaps, painful fluctuations. Trustees may, in order to provide the life beneficiary with a more steady income, accrue these income charges. (See Restatement, Trusts, § 233, comment [e]; 2 Scott on Trusts, § 233.2, p. 1262, and *Matter of Chapman,* 32 Misc. 187, 192, affd. 59 App. Div. 624, affd. 167 N. Y. 619.) Whether these charges are spread over a few years or are deducted from one year's income, is a matter between the trustee and the income beneficiary. The remaindermen have no concern with the effect of fluctuations upon the budgetary plans of the income beneficiary. If income is reserved to meet anticipated expenses chargeable wholly to income, the reserve belongs exclusively to income until the charge is actually incurred. This is merely a technique of administration which does not affect in any way the allocation of the expense. Since it is only for the benefit of the income beneficiary, it will presumably be adopted only where appropriate. No question of the propriety of such a reserve is here presented. Neither

income beneficiary nor trustee suggests the need of it. The principal beneficiaries have no interest in it.

For the reasons above stated, the court holds that the reserve which the special guardian demands would be wholly improper. The trustee is not required or permitted to maintain such a reserve.

Submit decree on notice accordingly.