115 N.J. Super. 165 (1971)
278 A.2d 517
HELEN M. SHILOWITZ, PLAINTIFF,
v.
STEPHEN SHILOWITZ, INDIVIDUALLY AND WITH JUSTIN C. HARRIS, AS EXECUTORS OF AND TRUSTEES OF TRUSTS CREATED IN THE LAST WILL AND TESTAMENT OF CHARLES SHILOWITZ, DECEASED, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 10, 1971.
*168 Mr. Thomas J. Brady for plaintiff (Messrs. Milton, Keane & DeBona, attorneys).
Mr. Irwin I. Kimmelman and Mr. Albert G. Besser for defendants (Messrs. Hannoch, Weisman, Stern & Besser, attorneys).
LYNCH, J.S.C.
Plaintiff here seeks assignment of her widow's dower from the rents and profits of a large highrise apartment building of which her husband died seized on September 25, 1968, and title to which is now held by defendant trustees under his last will and Testament.[1]
In the main, the question is: in arriving at the money value of the widow's dower in the rents and profits of the building, may the executor-trustees, in calculating the net rents available for plaintiff's dower, deduct from the rents received: (a) a reserve for depreciation of the property; (b) amortization of the mortgage on the property at the time of decedent's death; (c) interest on such mortgage; (d) a management fee of 4% of income. The trustees contend that such deductions are to be made before arriving at the net rents, 50% of which are to go to plaintiff as her dower interest. Plaintiff widow contends that such deductions may not be made. She also claims that she is entitled to exoneration from a mortgage on the property given to the Bowery Savings Bank (hereafter Bowery) on October 14, 1963, for the reason, so she says, that the indebtedness incurred at that time was one for which decedent was personally liable and that his personal estate was enhanced by the proceeds from that mortgage. She also seeks an award of counsel fees.
In contending that the aforementioned deductions should be made; the trustees submit their calculations of the widow's dower interest based upon the following schedule:

*169
 Calculation of Widow's Dower Interest
 Schedule "A"
 Estate of Charles Shilowitz  River House Property
 Income Statement
 Periods
 10-1-68 3-1-69 3-1-70
 to to to
 2-28-69 2-28-70 2-28-71
 ______________________________
Income $103,000 $254,700 $296,600
Less:
 Executors management fee
 4% of income 4,100 10,200 11,900
 Depreciation[2] 26,600 59,100 60,900
 Interest on mortgage 24,000 55,800 53,600
 Other ordinary costs and
 expenses of operations 58,600 113,500 135,800
 _______ _______ _______
Total costs and expenses 113,300 238,600 262,200
Net income (loss) before
mortgage amortization (10,300) 16,100 34,400
 Mortgage amortization 15,000 31,200 32,900
 _______ _______ _______
Amount available for Dower None None 1,500

The schedule submitted, while admittedly inexact as to the figures used, is nevertheless sufficiently representative to demonstrate the drastic consequences to the widow's dower interest if the contentions of the trustees are to be sustained. Thus, by reference to the last column of the schedule, covering the period from March 1, 1970, to February 28, 1971, the trustees contend that the net rents (as they conceive them and based on the figures used in the schedule) amount to $1500. Therefore, the trustees would allow the widow, since she is entitled to one-half of the net rents as her dower interest, $750 for the year specified. As will be seen, in *170 arriving at that result the trustees claim deductions for a "reserve for depreciation" in the amount of $60,900, plus amortization payments of $32,900, totalling $93,800 for the year. If these deductions were not to be allowed, then the net rents would amount to $95,300 and the widow's dower interest of 50% would yield to her the sum of $47,650 for the year involved. Further, if the trustees were not permitted to deduct the interest on the mortgage in the amount of $53,600 for the same period, the net rents and her share thereof for dower would be proportionately increased.
We shall first recount the history of the property, for it has relevance  at least as to the issue of plaintiff's claim for exoneration from the mortgage to Bowery.

History of the property
In 1953 decedent Charles Shilowitz acquired the tract in question in his own name for the purpose of erecting a multi-story apartment thereon. He formed River House Corporation, a New Jersey corporation, to which he conveyed the property on January 13, 1955. Plaintiff joined in the conveyance, thus releasing her then inchoate right of dower. Simultaneously with this conveyance the corporation executed a mortgage in the amount of $800,000 to the Brooklyn Savings Bank (hereafter Brooklyn) which was recast to $1,000,000 in 1957. Only the corporation was a party to these bonds and mortgages; decedent was not.
In 1963 the corporation was dissolved and, pursuant to a plan of liquidation, the property was conveyed once again to decedent, subject to the existing Brooklyn mortgage. Decedent did not assume the mortgage.
On October 14, 1963, decedent conveyed the River House property to his secretary, Rose Perolano, plaintiff again releasing her then inchoate right of dower by joining in the deed. On the same day Rose Perolano executed a new mortgage to the Bowery in the amount of $1,150,000, out of *171 which proceeds the Brooklyn mortgage, then amounting to $789,516.48 (hereafter rounded to $790,000), was satisfied. Decedent was not obligated on that mortgage or its accompanying bond. Rose Perolano thereupon immediately reconveyed the premises to decedent.
It is conceded that Rose Perolano, decedent's secretary, was a "straw man," used merely as a conduit through whom the title was intended to be, and ultimately was, returned to decedent in his own name. Defendant trustees contend that the main purpose of thus using the secretary was to immunize decedent from personal liability for the liens and debts then to be incurred. As will be seen below, such lack of personal liability is the crucial fact upon which defendants rest their argument that the widow is not entitled to exoneration from the Bowery mortgage.
Plaintiff further contends that of the $1,150,000 mortgage proceeds from Bowery, only $790,000 thereof was used to pay off the prior mortgage to Brooklyn. She further contends that the remaining sum of approximately $360,000 obtained from Bowery became the personal funds of decedent, that he was personally liable for the $360,000, and at least to that extent the widow was entitled to exoneration from the mortgage. Defendants assert that decedent obtained no personal benefit from the proceeds of the Bowery mortgage, that he was not personally liable thereon, and that therefore plaintiff is not entitled to exoneration.
We shall discuss the issues seriatim.

Depreciation
Bluntly put, the principal question here really is whether or not the widow, as doweress, should be responsible, to any extent, for depreciation of the building. In other words, should there be a deduction made from the net rents and profits, one-half of which would be owing to the widow for her dower interest, which deduction would be used to create a "reserve for depreciation"?
*172 Defendant trustees argue for such deduction, first, by analogizing a widow's dower rights to those of an ordinary life beneficiary under a trust or legal life estate, and, second, by citing some authorities, usually in the context of a trust, which would advocate a deduction for depreciation in arriving at a life beneficiary's share during his or her life.
The trustees acknowledge that Vice-Chancellor Bigelow, in In re Roth, 139 N.J. Eq. 588 (Prerog. 1947), held that depreciation was not to be deducted from a life tenant's share. But, say the trustees, Roth has been criticized. They cite 5 N.J. Practice (Clapp, Wills and Administration), § 442 (1969 Supp. at 131), and authorities cited therein, for their contention that a reserve for depreciation must be deducted. See particularly, notes, 60 Harv. L. Rev. 952 (1947); 63 Harv. L. Rev. 180 (1949); 55 Mich. L. Rev. 857 (1957); 4 U. Fla. L. Rev. 41 (1951); and Restatement, 2d Trusts § 239, comment (h) (1959), for critiques in a peculiarly trust (as opposed to dower) context. Defendants further direct the court's attention to cases cited in Clapp, op. cit., for their contentions here. In particular, their reliance is upon In re Kaplan's Will, 195 Misc. 132, 88 N.Y.S.2d 851 (Surr. Ct. 1949), and In re Warner's Trust, 263 Minn. 449; 117 N.W.2d 224 (Sup. Ct. 1962). Further, they argue that Roth incorrectly ignored Vice-Chancellor Stein's earlier opinion in Fidelity Union Trust Co. v. McGraw, 138 N.J. Eq. 415 (Ch. 1946) which held that under the testamentary trust there involved, a reserve for depreciation must be charged against income.
Defendant's argument is fallacious for several reasons. It would urge upon this court a decision which, as to dower, has never appeared in any reported case. Nor has it been advocated for application in a dower context by Clapp, op. cit., or any of the law review articles or other authorities cited by the trustees. Nevertheless, defendants would have a widow's dower thus diluted in face of the fact that from the earliest times dower has been deemed a favorite of the law. "Lord Bacon said as early as 1641 that it was then *173 `the common byword in the law that the law favored three things: (1) Life, (2) liberty, (3) dower' (Bacon, Uses, p. 37)." 17A Am. Jur., Dower, § 5 at 285. And in 25 Am. Jur.2d Dower and Courtesy, § 16, at 92:
The Year-Books and other early reports show the vigilance of the courts in watching over widows' interests. Some of the authorities have declared that dower is one of the positive institutions of the state, founded in policy.
In In re Alexander, 53 N.J. Eq. 96 (Ch. 1894), it was said:
"Dower was, indeed, proverbially the foster-child of the law, and so highly was it rated in the catalogue of social rights, as to be placed in the same scale of importance with liberty and life." Park, Dower, 2; Co. Litt. 124b. When it had attached by the seizin of the husband, it could not be discharged by any act of his, although the owner of the fee, without the wife's concurrent. [at 99; emphasis added]
See also, Shannon v. Watt, 87 N.J. Eq. 142 (Ch. 1916), aff'd 87 N.J. Eq. 611 (E. & A. 1917). Attempts to subvert or thwart a widow's dower will be closely and harshly scrutinized. Cf. 7 Clapp, op. cit., § 1667. Dower has been established as our legislative policy since 1799 (see Pat. Laws 343) and is now provided for in N.J.S.A. 3A:35-1 et seq. Before a court can indulge in so drastic an emasculation of the estate of dower as is here urged, it should expect to find either legislative revision of the Dower Act or decisional authority posing a clear and compelling mandate. Neither appears here.
While it is true that there is a degree of similarity between a widow's life tenancy in dower and a life estate created by a testator or settlor of a trust, the analogy, so far as relevant here, is more apparent than real. In the analysis of a trust or legal life estate the dominant inquiry is directed to the intent of the settlor or testator. Cf. Fidelity Union Trust Co. v. Robert, 36 N.J. 561 (1962). As to dower, the relevant intent is that of the Legislature, in the light of the scrupulous protection of a widow's dower interest which has *174 so long been provided. There is no room here, as there is in a trust context, for a husband's intent to impinge upon his widow's interest. Therefore, defendants' reliance on cases involving trusts is misplaced.
Thus it is with respect to defendants' citation of Fidelity Union Trust Co. v. McGraw, supra. That case involved construction of a trust. Dower was not involved. True, it was there held that an allowance for depreciation of property should be made against income in determining the remaining share due to the widow of the testator who had created the trust. It is perfectly apparent that the court, in deciding that depreciation must be charged against income, did so upon an analysis of the testator's intent in the creation of the trust, and, more particularly, with his intent as to whether or not there should be a provision made for depreciation. The vice-chancellor's task was made relatively easy in the latter respect, for paragraph Fourteenth of the will read: "With respect to any real estate which the Trustees may hold as part of the principal of any of the trusts, my Trustees shall be empowered to make such provision for deterioration and obsolescence with respect thereto as in their judgment may be wise." The trustees, seeking instructions, urged that they should be authorized to make an allowance for depreciation. Vice-Chancellor Stein said:
The creation of a sinking fund to provide against deterioration and obsolescence of the property held in trust in the manner here urged by complainants is consistent with the authorization granted complainants by paragraph `Fourteenth' of the will, when read in connection with that portion of paragraph `Fifth' of the will which authorizes the complainants to retain as an asset of the trusts any real property held by decedent at the time of his death, and when considered in the light of the history of the decedent's transactions in respect of the lease of the property in question, it becomes apparent that the testator intended to authorize complainants to do that for which they now seek judicial approval." [138 N.J. Eq., at 421; emphasis added]
On the other hand, in In re Roth, supra, Vice-Chancellor Bigelow held, in considering a trust wherein the widow was *175 the life beneficiary, that depreciation may not be charged against income in determining the widow's share. He said:
The remaindermen urge that on the resettlement of the accounts, a depreciation reserve be created by charging income annually with a sum equal to some reasonable percentage of the value of the buildings as at testator's death. Such a course is in harmony with modern accounting practice, but generally, as between life tenant and remaindermen, the latter must bear any loss due to depreciation and obsolescence. Mrs. Sameth cannot be required to suffer a deduction from income for the creation of a sinking fund to offset such a loss. Laflin v. Commissioner of Internal Revenue, 69 F.2d 460, 7 Cir. A tenant for life is bound to repair only to the extent of preventing permissive or actual waste. Kearney's Ex'r. v. Kearney, 17 N.J. Eq. 59, and 504. In fulfillment of this duty, it is said that he must keep the premises in as good repair as when his estate began, not excepting ordinary wear and tear. If, in the course of time, a new roof is needed, he should put it on; if paint wears off, he is bound to repaint. In re Steele, 19 N.J. Eq. 120; Murch v. Smith Manufacturing Co., 47 N.J. Eq. 193. But he is under no obligation in respect to the loss of economic value of a building which normally occurs. [139 N.J. Eq., at 596; emphasis added]
Defendants rely heavily upon the New York Surrogate's Court decision in In re Kaplan's Will, supra. Kaplan stands almost totally alone for the proposition that trustees are under a duty to set up a reserve for depreciation. Many cases in New York have held to the contrary. Cf. those cited in 3 Scott on Trusts (3d ed. 1967), § 239.4, at 2049. Needless to say, Kaplan does not involve dower. Shepardizing reveals that Kaplan has been cited on many occasions in New York and other states, but only one case has cited it with approval, In re Dahlmann's Estate, 95 N.Y.S.2d 74 (Surr. Ct. 1949). The precedential value of Dahlmann is weakened, however, by the fact that all parties there had consented to the setting aside of a reserve, and that the court limited its approval of the reserve to one providing only for physical (as opposed to economic) depreciation. Nevertheless, both Kaplan and Dahlmann were criticized and repudiated by coordinate surrogates in In re Davies' Estate, 197 Misc. 827, 96 N.Y.S.2d 191 (Surr. Ct.), aff'd 277 App. Div. 1021, 100 N.Y.S.2d *176 710 (App. Div. 1950), and In re Ball's Will, 197 Misc. 1047, 96 N.Y.S.2d 201 (Surr. Ct. 1950). Ball (at 203 of 96 N.Y.S.2d) referred to Kaplan and Dahlmann as based on "tenuous distinctions," and expressly followed the holding and analysis of Davies, supra. Since then, Davies has generally been held to control. See 3 Scott, loc. cit. The New York Court of Appeals in In re Hubbell's Will, 302 N.Y. 246, 97 N.E. 2d 888, 47 A.L.R.2d 176 (1951), expressly refused to reach the question. However, in In re Clarke's Trust, 306 N.Y. 733, 117 N.E.2d 910 (1954), the same court affirmed, per curiam, a lower court decision following a line of cases stemming from In re Davies, Estate, supra.
It was in Davies that the holding in Kaplan was met "head on" and was effectively repudiated in a thorough and analytical opinion by Surrogate Collins. He demonstrated the distinction between "a loss in value due to depreciation and a loss caused by the failure of a trustee faithfully to perform his duty to make repairs and to maintain the premises in proper condition." He said:
Much that is said in argument about depreciation of buildings is really meant to refer to real estate that is not maintained in proper condition. The distinction between the two must be kept clearly in mind. The present proceeding in no way involves any question respecting the trustee's performance of that duty or of liability for failure to perform it. [96 N.Y.S.2d at 197]
Surrogate Collins established that the New York rule had always been clearly understood as prohibiting a trustee from charging real property income with depreciation, at least (in a trust context) in the absence of a contrary direction in the will. He cited many New York decisions in support, and commented:
It is significant that in all that time, no decision, other than the one relied on by the special guardian [In re Kaplan's Will, supra], has ever held that a trustee must deduct from income annual sums to offset depreciation of real property. [At 197, 198; emphasis the court's]
*177 The court added that the New York rule had been in force in other jurisdictions, citing, among others, Vice-Chancellor Bigelow's opinion in In re Roth, supra.
Lastly, as to defendants' specific citations, we come to In re Warner's Trust, supra. A reading of that decision reveals that it avails defendants nothing. It is true that it ultimately resulted in a holding that a reserve for depreciation should be charged against the gross receipts for the building involved. But again, the case did not involve dower, but rather the construction of a trust, and the decision rested primarily on an analysis of the intent of the settlor of the inter vivos trust under consideration. Even in that context it will be noted that the court approached its decision cautiously, with several caveats. At the outset, it warned that it was necessary to recognize the type of depreciation which was being dealt with, i.e., physical depreciation alone, and added: "It may be conceded that economic depreciation must be absorbed by the corpus or principal of the trust the same as economic appreciation inures to the benefit of the corpus of the trust." 117 N.W.2d at 231; emphasis added. It is just such a reserve for economic depreciation that defendant trustees here would lift from the shoulders of the corpus remainderman and impose upon the life tenant here.
Again, in Warner, the court cautioned that, in considering the whole subject of depreciation, it should be kept in mind that:
* * * it is clear that the argument that general business practices should be applied to trust matters cannot be carried out entirely. In business accounting, we deal ordinarily with property owned by an individual or corporate enterprise in which there is no necessity for balancing the respective rights of those entitled to the income and those who eventually will become entitled to the corpus. [117 N.W.2d at 231, 232; emphasis added]
It will be recalled that Vice-Chancellor Bigelow, in Roth, supra, while conceding that setting aside of a reserve for depreciation might be in harmony with "modern accounting practice," also rejected such a standard when balancing the *178 respective rights of a life tenant and remainderman. The problem which we have here necessarily does involve the respective rights of the doweress and the ultimate remainderman. We are not presently concerned with "modern accounting practice." Lastly, said the court in In re Warner's Trust, supra, 117 N.W.2d at 232, business practices have been greatly influenced by tax considerations which do not necessarily bear importance in dealing with trust matters. Neither do such considerations have any place in a case involving admeasurement of a widow's dower.
Further, the trustees, in attempting to shift the burden from the remainderman to the life tenant in dower would impose upon her the cost of permanently preserving the present worth of the building. The increments to corpus thereby necessitated would redound only to the benefit of the remainderman upon ultimate distribution. In effect, she would be charged with the cost of a permanent improvement. It has long been established that the net rentals available for a widow's dower interest are calculated after deductions only for current charges such as taxes, interest on mortgages, repairs, insurance and other proper expenses. 7 Clapp, op. cit., § 1676, and cases cited therein. She is bound to repair only to the extent of preventing permissive or actual waste. As it was said in Kearney's Ex'r v. Kearney, 17 N.J. Eq. 504, 509 (E. & A. 1864): "As tenant for life she will of course be accountable for waste, but will be required to make no other repairs than such as are necessary to prevent waste." (Emphasis added). She is "under no obligation in respect to the loss of economic value of a building which normally occurs." In re Roth, 139 N.J. Eq. at 596, emphasis added. See also Burton v. Mellis, 75 N.J. Eq. 10 (Ch. 1909); Gerhardt v. Sullivan, 107 N.J. Eq. 374 (Ch. 1930); Alt v. Kwiatek, 128 N.J. Eq. 469 (Ch. 1941).
In Hudson County Nat'l Bank v. Woodruff, 122 N.J. Eq. 444 (Ch. 1937), modified on other grounds, 123 N.J. Eq. 585 (E. & A. 1938), the question arose as to whether or not in a trust the cost of rehabilitating properties (as distinct *179 from ordinary maintenance and repair costs) should be paid from income or corpus. The court said:
It follows as a result of the life tenant's duty to do his part in maintaining the value of the properties, that the cost of repairs consisting of such changes in the structure as are designed and required merely to keep it intact and in its original operating condition, are properly chargeable to and should be paid out of income. On the other hand the life tenant ought not to be required to permit income due him to be used to enrich the remaindermen. 4 Bogert on Trusts and Trustees, 2326, par. 803. If the changes to the property are of such a nature that they by increasing its utility and productivity, will add value to it, as turned over to the remaindermen, they probably should be paid for out of corpus. [at 451 emphasis added]
If the life tenant were to be charged with a reserve for depreciation she would be required "to permit income due [her] to be used to enrich the remainderman," contrary to the foregoing well established rule. Yet defendants would now upset judicial construction, long and repeatedly asserted, and unaltered by any legislative change. "A rule that has been so long accepted is not to be discarded readily or nullified by tenuous distinctions." In re Davies' Estate, supra, 96 N.Y.S.2d at 198.
Apart from precedent, let us examine the rationality of defendants' contentions. The crucial determinant is the reason for creating the depreciation reserve, at least when it is permitted. Given the fact that a building or other tangible improvement on realty will deteriorate and shrink in value with the passage of time, a reserve for depreciation is set aside to stand in place of the building or to contribute to expenditures aimed at maintaining its value. This maintenance of the value is undertaken for the purpose of maintaining the subject premises as a "quantum," a fixed monetary value, so that successive tenants or beneficiaries may enjoy it fully, without suffering the diminution of the ravages of time. Compare 3 Scott, op. cit., § 239.4, with Isaacs, "Principal-Quantum or Res?", 46 Harv. L. Rev. 776 (1933).
The underlying assumption behind this maintenance of value is that successive tenants have a right to enjoy the *180 property undiminished by the shrinkage wrought by decay and obsolescence. In a trust, be it inter vivos or testamentary, this may well be true; the allocation is a function of the intent of the testator. However, a life tenant is not responsible to the remainderman for combating depreciation, unless the intention of the creator of a trust or life estate clearly ordains it. Ordinarily a life tenant's responsibility is merely to refrain from the active commission of waste upon the premises. N.J.S.A. 2A:65-2; Dolid v. Leatherkraft Corp., 39 N.J. Super. 194 (App. Div. 1956); Roth, supra, at 596.
More specifically, with respect to dower it is said that:
With respect to repairs it should be observed that in general a life tenant is bound to keep his premises in as good a state of repair as they were when the life tenancy began. Murch v. Smith Mfg. Co., 47 N.J. Eq. 193, 20 A. 213 (Ch. 1890). In this regard the widow is put on the same footing as other tenants for life. Haulenbeck v. Cronkright, 23 N.J. Eq. 407, 409 (Ch. 1873), affirmed 25 N.J. Eq. 513 (E. & A. 1874). Hence the widow should be chargeable with ordinary repairs required to put the premises in as good repair as at the husband's death "including (as it has been held in one unreported case) the renewal of any part of the building thereon, that may, because of decay or ordinary wear require renewal." 7 Clapp, op. cit., § 1676, at 403, n. 6; [emphasis added]
The widow's position is akin to that of a legal life tenant, but not at all similar to that of an income beneficiary under a trust. The doweress must suffer the "natural depreciation" of the property insofar as it contributes to a lower rental income therefrom. She must also pay the ordinary expenses required to keep the property in "as good a state of repair as they were when the life tenancy began." Beyond ordinary wear and tear, however, she need not provide for major structural improvements, nor anticipate obsolescence.
In the case at bar the widow cannot enjoy actual possession of the property due to the impossibility of partition without great prejudice. N.J.S.A. 3A:36-3. The parties have not chosen to assign her a lump sum. R. 4:63-3. And *181 she is to take constructive possession of her dower interest by means of receiving her share of the annual rents and profits.
Just as we have seen that the widow need not be charged with improvements to benefit the remainderman (see Hudson County Nat'l. Bank v. Woodruff, supra), the converse is also true. That is, the widow ought not to be unduly benefited at the remainderman's expense. It might be suggested that, absolved of the duty to provide for depreciation, plaintiff is in a better position than she would be in, had she enjoyed actual possession of the real estate. This would be because plaintiff would, arguably, be insulated from suffering the effects of depreciation during her life.
In this case, that injustice simply does not arise. It is apparent that plaintiff will be fulfilling her limited obligations to the remainderman without defendants' proffered reserve. This is so because (a) she is responsible for everyday repairs the purpose of which is to maintain the building from ordinary wear and tear, and (b) the economic depreciation of the building will presumably inure to her detriment in the form of lower rental income.
Therefore, neither (a) public policy with respect to dower as established by the legislature, (b) judicial precedent, or (c) reason, supports defendants' attempt to deduct a "reserve for depreciation" in diminution of the widow's dower. Plaintiff's exception to the attempt to do so is sustained.

Exoneration
Plaintiff claims exoneration from the obligation of the mortgage, including interest thereon, owing to Bowery. Defendants deny such exoneration because, they say, decedent Shilowitz did not render himself personally liable for such obligation nor did he intend that he should be personally liable therefor. All parties recognize the applicable rule as to exoneration. It was stated in Campbell v. Campbell, 140 N.J. Eq. 144 (Ch. 1947), wherein Vice-Chancellor Berry *182 quoted from the case of McLenahan v. McLenahan and Johnston, 18 N.J. Eq. 101 (Ch. 1866) as follows:
In McLenahan v. McLenahan, supra (at p. 103), Chancellor Zabriskie said:
"Although the personal estate is the primary fund for the payment of the debts of a decedent, the rule is limited to debts created by him, or for which he has rendered himself personally liable, directly or primarily. Where lands subject to a mortgage debt, not created by the decedent, descend or are devised, the heir or devisee takes them cum onere, and is not entitled to have the debt paid out of the personal estate, unless the decedent has directly assumed the debt, intending (emphasis added) to make it a charge on her personal estate, or shall have so directed expressly by his will. It is not enough that he has assumed to pay the debt, or has rendered himself liable to be called on directly by the creditor to pay it.
"The authorities, ancient and modern, are uniform on these principles, although there is some difference as to what shall show the intention to assume the mortgage debt as a primary lien on the purchaser and his personal estate." (Italics mine.)
In Gerhardt v. Sullivan, supra (107 N.J. Eq. at p. 376), Vice-Chancellor Backes stated the rule and the underlying reasons therefor as follows:
"The right of the widow to call upon the personal estate to clear the land of encumbrances given to secure the husband's debts, in favor of her dower, rests upon the rule that the personal estate is the primary fund out of which his debts are to be paid and out of which it is presumed he intended they should be paid, and on the ground that the husband's personal estate was enhanced by the proceeds from the encumbrance put on the land. The rule, originally evolved to the advantage of the heir at law, and extended to widows, comprehends the debts of the husband whether incurred and secured by his land before or after marriage." (Italics mine.)
Note that in this statement it is: (1) the husband's debts which are to be paid out of the personal estate; and (2) that it is "presumed he intended they should be paid" out of the personal estate; and (3) that the husband's personal estate was enhanced by the proceeds from the mortgage encumbrances. [at 148, 149; emphasis added].
It is clear that when decedent (and his wife) joined in the deed to his secretary, Rose Perolano, who gave the mortgage to Bowery and then conveyed the property back to Shilowitz alone, it was Shilowitz' intent that he not be bound personally, on that obligation. The very purpose of using Perolano as a "straw man" was that he not be personally liable. In fact, he was not. Therefore, at least as *183 to the amount used from the proceeds of that mortgage to pay off the $790,000 due on the prior existing mortgage to Brooklyn, there could be no exoneration.
Plaintiff presses further with respect to exoneration, however, by contending that the excess over said $790,000, i.e., the difference between that sum and the amount of the Bowery mortgage of $1,150,000, should be subject to exoneration; this for the reason, says plaintiff, that said excess sum was used by the decedent to purchase bonds for his personal estate which was thereby enhanced by the proceeds of the mortgage.
In making this contention it is the plaintiff's burden to prove the fact by clear and convincing evidence. N.J.S.A. 2A:81-2; see, Germann v. Matriss, 55 N.J. 193 (1970). The only evidence introduced was that of a brother-in-law of decedent, Mr. Brigadier, who testified that decedent had said to him on several occasions that he would have about $300,000 above what he needed to pay off the "existing liens"; that he intended to purchase tax exempt bonds, and that decedent later said that he had in fact invested $300,000 in tax exempt bonds. But, pointedly, he did not say "where the money had come from" to make the purchase. Plaintiff points further to the fact that at the time of decedent's death the inheritance tax return showed tax exempt bonds in the amount of approximately $245,000. I am not persuaded by this testimony that in fact the excess over the $790,000 Brooklyn mortgage was so used that decedent's personal estate was enhanced thereby. And, since I find that decedent was not personally obligated on the Bowery mortgage the general rule which would preclude exoneration with respect to this mortgage is applicable. I hold that plaintiff is not entitled to exoneration therefrom.

Amortization
As to amortization, defendants attempt the syllogistic argument that, since plaintiff is not entitled to exoneration *184 from the mortgage on the property, and since her dower interest is subject to the mortgage, it follows that she is responsible for her share of amortization payments to be made upon it. The fallacy lies in the unarticulated minor premise that holding property subject to a mortgage is the same as assuming it or being liable thereon, or that as a life tenant doweress she is responsible thereon. True, to avoid foreclosure, payments must be maintained by someone having an interest in the property, and a doweress has such an interest which might motivate her to make such payments. But that fact does not settle the question as to which party, between doweress and remainderman, is responsible for them.
As we have seen, counsel have analogized the position of a doweress both to that of a life tenant at law and of the income beneficiary of a trust. We note once again that dower is a peculiar estate, with incidents which do not easily lend themselves to the analogies suggested. However, it will be necessary to analyze the parties' contentions to see where they are reconcilable with these peculiarities.
Proceeding from their argument that plaintiff is not entitled to exoneration, defendants next contend that there was no intent on the part of the deceased husband that his wife's dower interest be free from mortgage liability, either as to interest or principal. The fallacies here are threefold. First, as we saw above when considering depreciation, allocation of expenses and receipts between principal and income is determined by the intent of the creator of the interest be he grantor of a deed, settlor of a trust, or testator. Here, the creator of the interest is not the late Charles Shilowitz; it is the Legislature which enacted the dower statute (N.J.S.A. 3A:36-3). Therefore, any consideration of decedent's intent for this purpose is irrelevant.
Secondly, when we consider general trust principles (which defendants have unsuccessfully tried to avoid with the argument considered immediately above), we find that while interest on a mortgage may properly be charged against income, amortization of principal accrues against the corpus or principal *185 of the trust. 3 Scott, op. cit., § 233.2, at 1902, n. 1; Restatement, Trusts 2d, § 233(2), comment (e) (1959); 5 Clapp, op. cit., § 448, at 710, n. 1, and cases cited therein.
Thirdly, it is most inconsistent for defendants to rely on trust principles with respect to deductions for a depreciation reserve, and then disavow the same principles with respect to amortization. True, we have conceded that dower is a unique and peculiar estate, not susceptible of easy characterization. However, our view of its incidents departs from that asserted by defendants in both of these areas.
We must, however, deal with defendants' citation of Bahr v. Cooper, 141 N.J. Eq. 584 (Ch. 1948), in which the court specifically referred to payments on account of interest and principal as proper charges against a widow's dower share. It is true that, in that case, payments on account of principal were held chargeable against the dower interest. A careful reading of the opinion of Vice-Chancellor Fielder and an examination of the file therein demonstrates the following: The deceased husband died seized of three income-producing parcels (or, as it will appear, properties held for the production of income). He gave his wife a $3,000 legacy in lieu of dower "`because of her unkind and inhuman treatment' of him." Id. at 589. She was subsequently declared incompetent and her guardian brought suit for among other things, instructions as to whether to opt for the $3,000 legacy or to take a dower share over and against the will. The court remarked that the question of charges against the dower interest (to be allocated, as here, out of rents and profits) had not properly been raised in the pleadings. Id. at 585. Nevertheless the issue was dealt with. Although the court mentioned amortization of principal as a proper charge against income, it went further to state that the property would not produce sufficient income, with or without the charges contended for, to outweigh acceptance of the $3,000 gift in lieu of dower. Therefore, allowances for principal amortization were of no significance in the decision. In view of the haphazard way in which the amortization issue was raised in *186 Bahr, along with the elements of obiter dictum in the court's pronouncement, we must view its precedential value as suspect and unintended to the effect now claimed by defendant trustees here. This is especially so when we see the bulk of analogous authority to the contrary.
The court in Bahr (141 N.J. Eq. at 586) cited the following cases in support of the charges against income for dower purposes: Shields v. Hunt, 39 N.J. Eq. 485 (Ch. 1885); Lloyd v. Turner, 70 N.J. Eq. 425 ACh. 1905), and Alt v. Kwiatek, supra. Defendants in addition have cited Campbell v. Campbell, Gerhardt v. Sullivan, and McLenahan v. McLenahan and Johnston, all supra, for the same proposition, i.e., that the widow's dower interest is chargeable with, among other things, both interest and principal on mortgages. The court has considered all these cases, along with the case of Burton v. Mellis, supra, often cited in the cases above. While some of the cases deal with the question of exoneration (discussed above) and some mention mortgage interest as a proper charge, not one discusses or even refers to principal amortization as chargeable against dower.
In sum, we find no support for charging dower with amortization from the cases cited in Bahr v. Cooper, supra, or from that case itself. Defendants' cited authorities and asserted reasoning are similarly unavailing. We therefore follow the general rule and charge amortization to the remainderman and not to the life tenant. No deduction will be made from Mrs. Shilowitz' portion of rents and profits for amortization of principal.

Interest on mortgage
On the face of the pleadings, plaintiff claims to be entitled to payment without deduction even for mortgage interest, and so we must deal with this claim too. It appears from plaintiff's briefs and argument that her claim for freedom from interest is based entirely on her asserted right to exoneration. In default of exoneration, she concedes liability *187 for mortgage interest. In view of our findings and holding on the exoneration question, plaintiff's claim here must fail. A life tenant's and a doweress' responsibility for interest on mortgages has long been recognized. See Alt v. Kwiatek, supra, 128 N.J. Eq. at 474; 7 Clapp, op. cit., § 1676.

Management fee
At trial, counsel for defendant trustees stated that they would be "satisfied" with a management fee of 4% of gross rentals. Thus, allowance for such a fee is made in the Schedule set forth above.
Defendants produced as a witness one Herbert Bernfeld, a real estate broker, fully competent in this area. In his opinion a 5% fee would be reasonable. Also called as a witness for the defense was Justin C. Harris, a co-executor-trustee of decedent's estate. He testified to the services rendered by the executors in the management of the property, including their attendance to problems such as overseeing operation of the building on a day-to-day basis, reviewing credit statements and general qualifications of prospective tenants, reviewing all leases and negotiating with prospective tenants regarding their qualifications, tenant relations, study of comparable rents in other buildings, maintenance of equipment and purchase of replacements thereof when needed, examination of insurance coverage, and general day-to-day maintenance of the building. Harris, a certified public accountant, also prepares the financial statements for the building.
On cross-examination, Harris testified that $12,000 was allowed for office expenses, salaries and other expenses related to management. This is in addition to the 4% fee set forth in the schedule and is included therein under the heading: "other ordinary costs and expenses of operations."
I find that a reasonable management fee for this building is 5% of the gross rentals. However, Bernfeld, defendants' witness, testified that if his firm were to manage a building for 5% of the rentals, it would have provided the *188 clerical help and office expenses necessary for the task. In other words, all necessary expenses to manage the property would be subsumed in the 5% management fee. I therefore hold that defendants may charge a management fee of 5% of the rentals, but may not allocate any further sum under "other ordinary costs and expenses of operations," or elsewhere, for office and clerical help for salaries and office expenses related to management. The $12,000 now provided for under "other ordinary costs and expenses of other operations" is therefore disallowed.

Counsel fees
Plaintiff applies for counsel fees to be charged against decedent's estate. Her sole reliance is on the case of Risley v. Kirkman, 56 N.J. 464 (1970).
R. 4:42-9 is the only source for the award of a counsel fee. Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 167 (1960). The general policy is that every litigant is to bear his own costs. Id.; State v. Otis Elevator Co., 12 N.J. 1, 10 (1953).
The rule provides exceptions thereto for specific situations such as where there is a "fund in court." R. 4:42-9(a)(2). In order for an attorney to be entitled to compensation for his services from a "fund in court" he must have aided directly in creating, preserving or protecting the fund. In re Kleinberg, reported sub nom. In re Pynn-Hawley Co., 63 N.J. Super. 50, 55 (Cty. Ct. 1960). He is not entitled to such an award if his client sues merely for his own interest or benefit. Sunset Beach Amusement Corp. v. Belk, supra, 33 N.J. at 168.
Here plaintiff sues only for her own benefit in that she seeks to establish the amount of her dower. She has done nothing to create, preserve or protect any funds in court for the benefit of any members of a class. Katz v. Farber, 4 N.J. 333, 344 (1950).
With respect to Risley v. Kirkman, supra, plaintiff's reliance is misplaced. In that case there were two questions: *189 first, whether plaintiff was entitled to dower, and second, whether a constructive trust would be imposed on decedent's estate predicated on his oral promise to give plaintiff a weekly income for the rest of her life. She won on the question of constructive trust and it was in connection with that subject  and not dower  that counsel fees were awarded. The court said:
To require the widow to bear the cost of establishing the trust and its terms would, on the facts of this case, run against the very purpose of the trust, i.e. the fulfillment of the testator's primary aim that her actual needs be met. The allowance, however, must be confined to so much of the services as are fairly allocable to this facet of the case alone." [56 N.J. at 471 emphasis added]
In Risley, no fees were awarded on the issue of dower.
Plaintiff's application for counsel fees is denied. No costs.
NOTES
[1] N.J.S.A. 3A:36-3.
[2] The foregoing depreciation was established as a straightline depreciation assuming a 20-year useful life after the death of decedent. At trial the parties stipulated that, assuming depreciation were to be deducted, it should be calculated on the basis of a 24-year useful life. The parties further agreed that the figures in the schedule are not necessarily accurate and the court is not to be concerned with the exact figures which will be ultimately used to calculate the dower interest.